Erich LANE, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

Erich Lane, Appellant (Defendant),

v.

The State of Wyoming, Appellee
(Plaintiff).

Nos. 99–165, 99–166.

Supreme Court of Wyoming.

Nov. 14, 2000.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Ryan R. Roden, Assistant Appellate Counsel.

Representing Appellee: Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Robin Sessions Cooley, Senior Assistant Attorney General.

Before LEHMAN, C.J., and THOMAS, MACY,* GOLDEN & HILL, JJ.

MACY, Justice.

Appellant Erich Lane appeals from two judgments and sentences that were entered after he was convicted of burglary and second-degree murder.

We affirm.

### ISSUES

Lane submits three issues for review by this Court:

#### ISSUE I

Whether the trial court erred by failing to adequately instruct the jury on the legal definition of an essential element of the lesser included offense of voluntary manslaughter?

#### ISSUE II

Whether there was insufficient evidence to support Appellant's burglary conviction?

#### ISSUE III

Whether the Appellant was denied a fair trial as guaranteed by the Due Process Clauses of the United States and Wyoming Constitutions because of prosecutorial misconduct during the closing argument?

### FACTS

Although the tragic event at the basis of this case occurred in the early morning hours of December 28, 1997, it appears that the problems began on December 25, 1997, when Lane, his live-in girlfriend, and the victim attended a Christmas party together. At around midnight, Lane went home, leaving his girlfriend and the victim at the party. The girlfriend and the victim spent the night together, and the girlfriend did not get home until around two o'clock the following afternoon. At around eight o'clock that evening, the girlfriend left and again spent the night with the victim.

Lane awoke on December 27, 1997, to find that his girlfriend had once again failed to return home the night before. He called various friends in an attempt to locate her but was unable to determine where she was. Lane was upset over the apparent breakup of his relationship and spent part of the day packing the girlfriend's belongings.

* Retired June 2, 2000.

During the course of the day, Lane had some friends over to his apartment where they drank alcohol and smoked methamphetamine. Later that evening, another friend arrived and informed Lane that his girlfriend was seeing the victim and they were together that evening. Upon hearing this news, Lane went into his bedroom and began slamming things around.

Later, Lane and another friend decided to drive around town in an attempt to find the girlfriend. Unsuccessful in this endeavor, Lane directed his friend to drive to the victim's house. Lane could tell the house was empty. He threw two large rocks through the front windows of the house and crawled through the broken windows. While inside the house, Lane stuffed the bathroom and kitchen drains with papers and clothing he had found in the house and turned on the faucets to cause a flood. Before exiting, Lane grabbed a lockbox and a box of glassware. He tossed the items into the car, and the two friends headed back to Lane's apartment. Realizing one of the boxes was filled with glasses, Lane dropped it off near some trash cans.

Mingles Billiards Lounge was on the route back to the apartment, and Lane instructed his friend to drive through its parking lot. The victim happened to be walking in the parking lot at that time on his way to warm up his vehicle. Lane confronted him. After an exchange of words, Lane went inside the lounge to talk to the girlfriend. It was at this point that the girlfriend told Lane their relationship was over. Lane told the girlfriend he still loved her and left upset.

Lane and his friend left Mingles and headed back to Lane's apartment. Once he got back to his apartment, Lane opened the lockbox. He kept some of the items he found inside and then instructed his friend to get rid of everything else. He told his friends to leave because "[t]his [was] not going to be a happy place."

In the meantime, the victim and the girlfriend returned to the victim's home and discovered the mess Lane had caused. The girlfriend called Lane to ask him why he did it. While she was talking to Lane, she said the victim was angry and was yelling and screaming in the background that he was going to "kick Erich's ass." Although the girlfriend was not sure whether Lane heard

any of the things the victim was yelling, one of Lane's friends who had not yet left the apartment testified that, after hanging up the telephone, Lane seemed very nervous and told him to leave because the victim was on his way over and would be spraying bullets.

The victim did go to Lane's apartment. Lane maintains that the victim kicked in the door to gain access, but the physical evidence at the trial suggested the door was broken from the inside out because the glass was lying on the ground outside the door. In any event, the victim entered the apartment and proceeded to the bedroom where he was shot once from a distance of approximately four feet and three more times at point blank range. All four bullets entered the victim's back. As the victim lay slumped over Lane's bed, Lane called 911 and reported that he had just shot an intruder. The victim died from the gunshot wounds. Lane was arrested and charged with burglary and first-degree murder. The jury convicted him of burglary and second-degree murder. Lane appeals from those convictions.

## DISCUSSION

### A. Instruction

In Lane's first claim of error, he contends the trial court did not adequately instruct the jury on the legal definition of an essential element of voluntary manslaughter. He maintains that, because voluntary manslaughter is a lesser-included offense of second-degree murder, the trial court should have provided the jury with an instruction defining "upon a sudden heat of passion." The state replies that the failure to give such a definition did not result in a violation of a clear and unequivocal rule of law.

■ Lane did not object to the instruction as given at the trial, nor did he offer an instruction with the proposed definition. We, therefore, review this claim under our plain error analysis.

A three-part test has been established for determining whether an error may achieve the status of plain error. First, the record

must be clear as to the incident which is alleged as error. Second, the party claiming that the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove that a substantial right has been denied him and as a result he has been materially prejudiced. *Bradley v. State*, 635 P.2d 1161, 1164 (Wyo. 1981); *see also Rivera v. State*, 987 P.2d 678, 680–81 (Wyo.1999).

■ A trial court has a duty to instruct the jury on the general principles of law applicable to the case before it. *Brett v. State*, 961 P.2d 385, 389 (Wyo.1998). Jury instructions inform the jury about the applicable law so it may apply that law to its factual findings. *Miller v. State*, 904 P.2d 344, 348 (Wyo.1995). A trial court is given wide latitude in instructing the jury, and we will not find reversible error as long as the instructions given to the jury correctly state the law and adequately cover the relevant issues. *Germany v. State*, 999 P.2d 63, 69 (Wyo.2000). An appellant must demonstrate prejudicial error, and prejudice will not be demonstrated unless the instruction confused or misled the jury with respect to the proper principles of law. *Lowseth v. State*, 875 P.2d 725, 729 (Wyo.1994).

■ Jury instructions are to be written with the particular facts and theories of each case in mind and may differ from case to case because any one of several instructions may be legally correct. *Miller*, 904 P.2d at 348. A failure to give an instruction on an essential element of a criminal offense is fundamental error, as is a confusing or misleading instruction, requiring reversal of the defendant's conviction. *Id.* A court is not required to give an instruction defining a term, however, unless the term has a technical legal meaning so different from its ordinary meaning that the jury, without further explanation, might misunderstand its import in relation to the factual circumstances. *Cardenas v. State*, 811 P.2d 989, 996 (Wyo. 1991). "A jury instruction must leave no doubt as to under what circumstances the crime could be found to have been committed in the particular case." *Pierson v. State*, 956 P.2d 1119, 1126 (Wyo.1998).

■ The record clearly demonstrates that the jury received the following instructions:

### INSTRUCTION NO. 2

The elements of the crime of murder in the first degree are:

1. On or about the date of December 28, 1997, in Laramie County;

2. The defendant, Erich Lane, killed [the victim]; and

3. Purposely;

4. With premeditation; and

5. With malice.

If you find from your consideration of all the evidence that any of these elements has not been proven beyond a reasonable doubt, then you should find the defendant not guilty.

If, on the other hand, you determine that the State has established beyond a reasonable doubt[ ] that the defendant did not act reasonably in self-defense and you find from your consideration of all the evidence that each of these elements has been proven beyond a reasonable doubt, then you should find the defendant guilty.

### INSTRUCTION NO. 6

If you are not satisfied beyond a reasonable doubt that the defendant is guilty of first degree murder, he may, however, be found guilty of any lesser offense, the commission of which is necessarily included in the offense charged, if the evidence is sufficient to establish the guilt of such lesser offense beyond a reasonable doubt. The offense of first degree murder, with which the defendant is charged, may include the lesser offenses of second degree murder and manslaughter.

### INSTRUCTION NO. 7

The elements of the crime of murder in the second degree are:

1. On or about the 28th day of December, 1997, in Laramie County;

2. The Defendant, Erich Lane[,] killed [the victim];

3. Purposely[;] and[ ]

4. With malice, but without premeditation[.]

First degree murder requires among other elements, proof of premeditation. Second degree murder does not require proof of premeditation. That is the difference between first degree and second degree murder.

If you find from your consideration of all the evidence that any of these elements has not been proven beyond a reasonable doubt, then you should find the defendant not guilty.

If, on the other hand, you determine that the State has established beyond a reasonable doubt[ ] that the defendant did not act reasonably in self-defense and you find from your consideration of all the evidence that each of these elements has been proven beyond a reasonable doubt, then you should find the defendant guilty.

**INSTRUCTION NO. 8**

The elements of the crime of voluntary manslaughter are:

1. On or about the 28th day of December, 1997[,] in Laramie County;

2. The Defendant, Erich Lane, killed [the victim];[ ]

3. Voluntarily;

4. Upon a sudden heat of passion[.]

If you find from your consideration of all the evidence that any of these elements has not been proven beyond a reasonable doubt, then you should find the defendant not guilty.

If, on the other hand, you determine that the State has established beyond a reasonable doubt[ ] that the defendant did not act reasonably in self-defense and you find from your consideration of all the evidence that each of these elements has been proven beyond a reasonable doubt, then you should find the defendant guilty.

In asserting that a transgression of a clear and unequivocal rule of law occurred, Lane argues that "upon a sudden heat of passion" is an essential element of the voluntary manslaughter offense and it must be defined. He relies on this Court's decisions in *Yung v. State*, 906 P.2d 1028 (Wyo.1995), and *State v.*

*Keffer*, 860 P.2d 1118 (Wyo.1993), to support his argument. Lane's interpretation of these cases overstates their holdings.

We begin by examining our decision in *Jahnke v. State*, 692 P.2d 911, 919 (Wyo. 1984), where we said "upon a sudden heat of passion" was not a true element of the voluntary manslaughter offense but was "simply a way of saying that the element of malice required for murder in the second degree and also murder in the first degree is not required." We said in our *Keffer* opinion that the phrase "voluntarily, upon a sudden heat of passion" states a single element of the voluntary manslaughter crime. 860 P.2d at 1138. This is consistent with what we said in *Jahnke* when we said "upon a sudden heat of passion" is a descriptive phrase describing the mens rea element of voluntariness. 692 P.2d at 919. In *Yung*, however, the defendant attempted to utilize "upon a sudden heat of passion" as an affirmative defense. 906 P.2d at 1035. In rejecting his affirmative defense argument, this Court said "upon a sudden heat of passion" is an element of the voluntary manslaughter offense rather than an affirmative defense. *Id.* After close reflection, we conclude that, when we made that statement, we inadvertently overstated our holding in *Keffer*. The phrase "upon a sudden heat of passion" is so connected to the voluntariness element that the words are often used interchangeably in casual conversations. This is what we did in *Yung*. We did not intend to stray from our previous holdings, and we correct our error here.

Accordingly, we find no error, plain or otherwise, in the trial court's failure to define the phrase. Although some trial courts may choose to define the phrase in their instructions to juries, it is not an essential element that has a definite, technical meaning under the law which is different from the ordinary meaning. Therefore, the trial court was not required to define it.

**B. Sufficient Evidence**

Lane next claims the evidence presented at the trial was insufficient to support his burglary conviction. He maintains that, because the state did not specify whether it was

relying on the intent to commit larceny or the intent to commit a felony branch of the offense, it was required to present sufficient evidence of both. The state agrees it was required to present sufficient evidence of Lane's intent to commit both larceny and a felony but insists it did so.

When reviewing a sufficiency of the evidence claim in a criminal case, we analyze whether a rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. *Williams v. State*, 986 P.2d 855, 857 (Wyo.1999). We do not consider conflicting evidence presented by the unsuccessful party, and we afford every favorable inference to the successful party's evidence which may be reasonably and fairly drawn from that evidence. *Bloomquist v. State*, 914 P.2d 812, 824 (Wyo.1996). We will not substitute our judgment for that of the jury but will only determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did. *Id.*

Lane does not claim the state failed to present sufficient evidence that he intended to commit larceny. Rather, he only argues that the state failed to present sufficient evidence that he intended to commit a felony inside the victim's house and it, therefore, failed to provide sufficient evidence of both larceny and felony property destruction. We, accordingly, will limit our analysis to whether the state presented sufficient evidence to establish that Lane entered the victim's home with the intent to commit felony property destruction.

Lane contends the evidence presented at the trial failed to quantify the dollar amount of damage caused to the victim's house. He also complains that the jury was not instructed regarding when the intent needed to be formed or on whether Lane had to possess the intent to destroy $500 or more of property when he entered the house. He directs our attention to a question from the jury as evidence of its confusion on the matter. The jury asked: "In regard[ ] to the crime of [b]urglary and [v]andalism, what constitutes a felony and what constitutes a misdemeanor?" The parties agreed to respond that the burglary instruction required consideration of whether the entry was made either with the intent to steal or with the intent to commit a felony inside. The response also explained: "In order for vandalism to constitute a felony[,] the intent to destroy must amount to property valued at $500.00 or more."

In determining whether the evidence of Lane's intent to commit felony property destruction was sufficient, we begin by examining Lane's own testimony. He admitted he broke out two front windows to gain entrance to the house. He also acknowledged that he clogged the bathroom and kitchen drains and turned on the water. One of the investigating officers testified that the rocks were large enough and thrown hard enough to damage the wall across the room from the windows. This evidence, along with the girlfriend's testimony that the apartment was a mess and the photographs depicting the damage, was sufficient, even in the absence of evidence of specific amounts, to support the jury's conclusion that the damage to the victim's home was in excess of $500.

We turn our attention next to Lane's argument that the jury should have been instructed as to when the intent to commit a felony needed to be formed. He insists he did not intend to steal or commit a felony inside when he entered the house. "Proof of intent is not a precise process, and it would be impossible to list all the circumstances from which a jury might properly infer the intent to steal." *Williams*, 986 P.2d at 857. " 'Suffice it to say they are numerous, various, and the quantum of proof required necessarily depends on the totality of the circumstances presented.' " *Id.* (quoting *Mirich v. State*, 593 P.2d 590, 593 (Wyo.1979)).

The jury was instructed in accordance with the burglary statute. It was told that Lane had to have entered the house with the intent to steal or commit a felony inside. Although Lane denied having the intent to do anything criminal inside the house when he entered it, the jury obviously did not believe him. The totality of the evidence supports the jury's rejection of Lane's denial in arriving at the opposite conclusion.

 Lane suggests the jury should have been instructed that not only did he have to intend to commit felony property destruction when he entered the victim's home but also he had to intend to destroy $500 or more of property when he entered the house. He does not direct our attention to any authority to support such a position, nor are we aware of any. Nowhere in the Wyoming statutes do we find a requirement that a defendant know the value of what he steals or destroys before he can be convicted of a felony.

## C. Prosecutorial Misconduct

In his last claim of error, Lane contends the prosecutor's remarks in his closing argument deprived him of a fair trial. He asserts that the prosecutor violated established rules of law when he commented on Lane's truthfulness and credibility, vouched for the credibility of witnesses, commented on Lane's right not to incriminate himself, attacked the defense counsel's integrity, and shifted the burden of proof to Lane. The state insists that the prosecutor did not improperly urge the jury to convict Lane on anything other than the evidence presented at the trial.

 The defense did not object to four of the five challenged remarks. We, accordingly, utilize the plain error standard of review, which we set out in our discussion of Lane's first issue, and will reverse only when we find that there was "a substantial risk of a miscarriage of justice." *Dice v. State*, 825 P.2d 379, 384 (Wyo.1992).

In presenting closing argument, the prosecutor is entitled to reflect upon the evidence and to draw reasonable inferences from that evidence to assist the jury in its function. "The purpose of closing argument is to allow counsel to offer ways of viewing the significance of the evidence." However, we have often stated that a prosecuting attorney may not inject his opinion as to the weight of the evidence when arguing to the jury.

*Leiker v. State*, 994 P.2d 917, 919 (Wyo.1999) (quoting *Virgilio v. State*, 834 P.2d 1125, 1127 (Wyo.1992) and citations omitted). "The question of the propriety of a given statement is not one that can be decided by reference to a judicial checklist of improper words or prohibited phrases to determine if error is present." *Barela v. State*, 787 P.2d 82, 83 (Wyo.1990).

### 1. COMMENTS REGARDING LANE'S TRUTHFULNESS AND CREDIBILITY

In arguing that the prosecutor made improper comments regarding his truthfulness and credibility, Lane directs our attention to the number of times the prosecutor referred to him as a liar. The state responds that the prosecutor's comments were permissible comparisons between Lane's version of events and what the evidence revealed.

We have previously analyzed similar statements. In *Barnes v. State*, 642 P.2d 1263, 1265-66 (Wyo.1982), we said "calling a defendant a thief and a liar may not be in good taste" but, when the evidence supports a reasonable inference that such is in fact the case, it does not constitute reversible error to argue the question. In *Tennant v. State*, 786 P.2d 339 (Wyo.1990), we considered a prosecutor's reference to a defendant as a leech, bloodsucker, and predator on society and the prosecutor's suggestion that perhaps next time the defendant could choose crippled children as his victims. We concluded that, although the prosecutor's remarks were unprofessional, they did not fit within the kind of statements this Court has deemed prosecutorial misconduct under the plain error analysis. 786 P.2d at 346.

 After reviewing the prosecutor's closing argument, we conclude his remarks were made to highlight the way Lane's statements changed over the course of his several interviews with the police and to emphasize the fact that the physical evidence was not consistent with Lane's version of the events. Although the prosecutor's repeated labeling of Lane as a liar might have been in bad taste, the evidence supported the reasonable inference that such was the case. The references, therefore, did not rise to the level of plain error.

### 2. CREDIBILITY OF WITNESSES

Lane also complains about the prosecutor's remark that his friends testified truthfully at the trial. The state replies that, when con-

sidered in context, the comments were permissible as proper inferences drawn from the testimony.

■ It is improper for the prosecuting attorney, even in responding to defense arguments, to personally vouch for the credibility of the state's witnesses. *Harper v. State,* 970 P.2d 400, 403 (Wyo.1998). In *Barela,* we stated the rationale for this rule:

> When the prosecutor asserts his credibility or personal belief, an additional factor is injected into the case. This additional factor is that counsel may be perceived by the jury as an authority whose opinion carries greater weight than their own opinion: that members of the jury might be persuaded not by the evidence, but rather by a perception that counsel's opinions are correct because of his position as prosecutor, an important state official entrusted with enforcing the criminal laws of a sovereign state. While the prosecutor is expected to be an advocate, he may not exploit his position to induce a jury to disregard the evidence or misapply the law.

787 P.2d at 83–84.

■ Put in context, the prosecutor remarked:

> [Lane's friend] told you about it. He goes over there because he felt compelled to tell his good friend, very good friend. In fact, you recall the gestures as he got off that witness stand. He went by Erich, went, I'm with you all the way. I don't pick these witnesses. I didn't pick [this friend]. I didn't pick [another friend]. I didn't pick [another friend]. He picked my witnesses for me, because those are the people he hangs with. That's what I use. Those are his friends.
>
> It's interesting we manage to still get his friends to come into this Court and tell the truth.

At no point did the prosecutor personally vouch for the credibility of these witnesses. In fact, he may have even inferred from his comments that the witnesses were not of the highest character. He simply pointed out the reasonable inference that the witnesses were telling the truth because, being good friends with the defendant, if they were inclined to lie, they would undoubtedly do so in Lane's favor.

### 3. RIGHT AGAINST SELF INCRIMINATION

■ Lane next challenges the prosecutor's comments regarding the fact that he failed to disclose numerous material details about the night's events during his first police interview. He complains that such comments violated his right not to incriminate himself. The state counters that the prosecutor was simply commenting on the evidence presented during the trial.

Lane maintains that he initially chose not to incriminate himself but later decided to speak to the police. He argues:

> This invocation of rights initially and then rescinding does not mean the prosecuting attorney can use that invocation as evidence of guilt. " 'The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries.' " *Jerskey v. State,* 546 P.2d 173, 179 (Wyo. 1976) (quoting *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

We agree with the state's observation that Lane did not invoke his rights initially and then waive them later but willingly spoke with the investigating detective from the beginning after being informed of his constitutional rights and waiving them. Given this set of circumstances, the prosecutor could not have commented on Lane asserting his right to remain silent because he did not assert that right. The prosecutor merely commented on the factual omissions Lane admitted leaving out of his voluntary interview with the police. *Emerson v. State,* 988 P.2d 518, 522 (Wyo.1999).

### 4. ATTACK ON THE DEFENSE COUNSEL'S INTEGRITY

■ Lane claims the prosecutor inferred that the defense attorney "suborned perjury by having his client modify his testimony." The state responds that the comments did not attack the defense counsel but were instead directed at Lane, suggesting he had molded his testimony after reviewing his case

with his attorney in an effort to circumvent the elements of the burglary statute.

■ Although attacks upon the personal peculiarities and idiosyncrasies of the opposing counsel are improper, the challenged remarks do not fall within this category. *Leiker*, 994 P.2d at 920. The prosecutor said:

> Now he takes that witness stand, and he says, [o]h, yes, I just went in; and while I was in there I decided to take something. I didn't form that intent to steal until after I was in there. Ladies and gentlemen, that's a technical defense by lawyers. That's not something lay witnesses know. We didn't hear that at any time. That's something that comes up after you talk to your lawyer. That's all that is.

These comments were an appropriate inference from the evidence presented at the trial that Lane was molding his story to fit the evidence.

■ Lane also claims the following comment was an improper attack on the defense counsel:

> You recall the cross-examination? [The defense counsel] went after [the SWAT officer] hard, so hard he got angry because he didn't want that glass on the outside. He wanted forced entry on the inside. He didn't want the officer['s] opinion to convince you this is a big crime scene.

This comment did not improperly attack the defense counsel. It merely highlighted that the discrepancy between Lane's version of events and what the physical evidence demonstrated could not be overcome despite defense counsel's best efforts in cross-examining the witness.

### 5. BURDEN SHIFTING

■ Lane goes on to complain that the prosecutor shifted the burden of proof to him with the following remarks:

> [PROSECUTOR]: Don't let [the defense counsel] create for you by argument testimony that never occurred from that witness stand. I mean, it's something that

I trust you dearly to be able to discern amongst your 12 collective minds, what the truth was and what he would like it to be. Because my job is to put all of you in one frame of mind. I have to convince all 12 of you unanimously beyond a reasonable doubt that [the victim] was murdered. His job is only to confuse one of you to hang the jury.

> [DEFENSE COUNSEL]: Objection, Your Honor, that's improper argument.

> THE COURT: I think it might be, [Prosecutor].

> [PROSECUTOR]: Our burden of proof differs considerably, ladies and gentlemen. Our burden of proof is to convince you, his is not.

We agree with Lane that a basic premise in our criminal law is that the burden of proof rests upon the state and never shifts. *Harper*, 970 P.2d at 405. We fail to see, however, how the prosecutor shifted the burden of proof by these comments. In fact, the prosecutor emphasized that it was his burden to convince all twelve jurors of Lane's guilt. A suggestion that all the defense counsel had to do to thwart the prosecutor's efforts was to confuse one of the jurors did not convey the message that Lane bore the burden of proving his innocence.

### 6. CUMULATIVE ERROR

Lane contends the cumulative effect of the errors he asserts above deprived him of a fair trial. None of the comments Lane challenged resulted in error, and, therefore, an accumulation of error sufficient to warrant a reversal of this case did not occur.

Affirmed.