2003 WY 163

**Ronald Lee WHITE, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 02–268.

Supreme Court of Wyoming.

Dec. 19, 2003.

Representing Appellant: Kenneth M. Koski, Public Defender; and Donna D. Domonkos, Appellate Counsel.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Robin Sessions Cooley, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, and VOIGT, JJ., and JAMES, D.J.

VOIGT, Justice.

[¶ 1]   In June 2002, a Carbon County jury found the appellant, Ronald Lee White, guilty of soliciting a minor under age sixteen to engage in illicit sexual relations in violation of Wyo. Stat. Ann. § 14–3–104 (Lexis-

Nexis 2003), a felony.[1] On appeal, the appellant contends that the prosecutor committed misconduct by eliciting improper hearsay, character, and victim impact testimony during the prosecution's case-in-chief and improperly shifting the burden of proof and vouching for the credibility of a witness during closing argument. We affirm.

### ISSUES

[¶ 2] The appellant presents the following issues for our review:

> Whether the prosecutor committed prosecutorial misconduct when he elicited prejudicial victim impact statements, vouched for the credibility of the State's witness, shifted the burden of proof and elicited hearsay testimony of a prior bad act without notice to defense counsel?

### FACTS

[¶ 3] On September 16, 2001, Iva Bilger (Bilger) asked the victim, age fifteen, to babysit Bilger's four-month-old son for a few hours. According to the victim, the appellant knocked on Bilger's door while the victim was babysitting and identified himself as the infant's grandfather. The appellant stated that he was "passing through" and "wanted to see the baby." Believing the appellant to be Bilger's father, the victim allowed the appellant to enter the apartment. The victim heard the appellant lock the front door upon entering the apartment, prompting her to wonder "What's going to happen to me"? The appellant began staring at the victim because, he said, she was "beautiful. . . ." He commented that "he wished he was younger because younger guys should like" the victim and asked the victim's thoughts on interracial dating and younger girls dating "older guys" (the appellant stated he was forty-two years of age).

[¶ 4] The appellant then reportedly informed the victim that he was "7 inches long," that she "could try it" and if that was not "big enough" for her, she could "move on to bigger and better." When the victim attempted to refocus the appellant's attention by playing with the infant, the appellant removed the infant. According to the victim, the appellant then asked about her personal hygiene, how much the victim "would charge him to have sex" with her, and whether she was interested in that proposition. The victim became "real hot" and "real nervous" and needed to take off her jacket, but the appellant told her she couldn't take off the jacket unless she also took off her shirt. The appellant told the victim about his body piercings, offered similarly to pierce the victim and buy her jewelry, and said that the victim should stop by his trailer if she was ever in Wamsutter. The appellant eventually stated that he should leave before Bilger returned and that if the victim told anyone about the encounter, he would put his "boot in [her] ass and take [her] out south." Bilger testified that the following day, the appellant phoned her and admitted that he asked the victim to "marry him, have sex with him"; "he wanted a sexual marriage relationship with her."

[¶ 5] Deputy Jeff Walton of the Carbon County sheriff's office first interviewed the victim on September 17, 2001. The contents of that interview according to the deputy's testimony appear to coincide with the victim's trial testimony.[2] Deputy Walton interviewed the appellant on September 18, 2001. According to Deputy Walton, the appellant admitted that he was alone with the victim at Bilger's residence and told the victim how "beautiful or good looking she was." The appellant stated that he and the victim discussed her breakup with a twenty-one-year-old boyfriend and she mentioned that she liked dating older men. Deputy Walton testified that the appellant provided conflicting information regarding several details, including the amount of time he was alone with the victim. The appellant did not testify at trial.

---

1. Wyo. Stat. Ann. § 14–3–104 provides as follows:

    > Except under circumstance[s] constituting sexual assault in the first, second or third degree as defined by W.S. 6–2–302 through 6–2–304, anyone who solicits, procures or knowingly encourages anyone under the age of sixteen

(16) years to engage in illicit sexual penetration or sexual intrusion as defined in W.S. 6–2–301 is guilty of a felony. . . .

2. The appellant's trial counsel did not object to this testimony.

[¶ 6]   In June 2002, a jury found the appellant guilty of soliciting a minor under age sixteen to engage in illicit sexual relations in violation of Wyo. Stat. Ann. § 14–3–104. The district court sentenced the appellant to serve a four- to five-year term of imprisonment and to pay $3,060.00 in restitution for the victim's counseling and funds expended on the victim's behalf, $2,235.00 in public defender's fees, and other mandatory fees. The appellant appeals from that judgment and sentence.

## STANDARD OF REVIEW

[¶ 7]   We review allegations of prosecutorial misconduct " 'by reference to the entire record. . . .' " *Mazurek v. State*, 10 P.3d 531, 542 (Wyo.2000) (*quoting English v. State*, 982 P.2d 139, 143 (Wyo.1999)). Such allegations " 'hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial.' " *Mazurek*, 10 P.3d at 542 (*quoting English*, 982 P.2d at 143).

Prosecutorial misconduct "has always been condemned in this state." *Valerio v. State*, 527 P.2d 154, 156 (Wyo.1974). Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error ... affected the accused's "substantial rights." The accused's right to a fair trial is a substantial right. Wyo. Const. art. 1, §§ 6, 9, and 10; *and see, e.g., Jones v. State*, 580 P.2d 1150, 1154 (Wyo.1978). Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused. *Jones v. State*, 735 P.2d 699, 703 (Wyo.1987). We read this standard to be in consonance with the standard followed by the United States Supreme Court[.]

*Earll v. State*, 2001 WY 66, ¶ 9, 29 P.3d 787, 789–90 (Wyo.2001). *See also Lancaster v. State*, 2002 WY 45, ¶ 31, 43 P.3d 80, 93–94 (Wyo.2002). The appellant bears the burden of establishing prosecutorial misconduct. *Lancaster*, 2002 WY 45, ¶ 32, 43 P.3d at 94.

[¶ 8]   The appellant did not object to any of the alleged misconduct at trial.   On appeal, it is therefore incumbent upon the appellant to demonstrate plain error in that "the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right." *Compton v. State*, 931 P.2d 936, 939 (Wyo.1997).

## DISCUSSION

### IMPROPER HEARSAY*CHARACTER EVIDENCE

[¶ 9]   The appellant contends that, on redirect examination, the prosecutor elicited improper hearsay and W.R.E. 404(b) testimony from Bilger regarding an incident involving the appellant and Bilger's neighbor.   The appellant's trial counsel, not the prosecutor, first referred to the alleged incident during his cross-examination of Bilger and utilized it extensively in attempting to attack Bilger's credibility and support the appellant's theories of the case.

[¶ 10]   On cross-examination, Bilger testified as follows:

[Defense counsel:]   ...   Isn't it true that when you were questioned by the deputy sheriff about this, that you told the deputy sheriff that Ron White had sexually assaulted one of your friends a week or two prior to this?

[Bilger:] Yes.

Q.   So now you're telling us that you knew that—or you thought Ron White sexually assaulted one of your friends two weeks prior to this, but you still had him stay over at your house?

A.   Yes.

Q.   And you weren't afraid; is that correct?

A.   In fact, it was the weekend before, I believe.

Q.   So you're telling us that you thought that Ron White was sexual[ly] assaulting one of your friends, but you weren't afraid of him?

A.   I knew he wouldn't touch me.   I wouldn't allow it.

Q. Mr. White's a lot larger than you, isn't he?

A. Yes.

Q. So if he were to decide to do something, there wouldn't be much you could do, would there?

A. Yes.

Q. What would that be?

A. I do know how to defend myself.

Q. Did your friend know how to defend herself?

A. Apparently not.

Q. Okay. So you weren't afraid that Ron White was going to do anything?

A. I had too much company.

Q. When you were staying with him alone?

A. No, I was never completely alone with him.

Q. Well, besides your young son, you were alone with him during that day, weren't you, on that Monday?

A. My neighbor was there.

Q. And the day before that, you were alone with him, weren't you?

A. My neighbor was there.

. . .

Q. There was no mention of anybody else being present in the statements to police.

A. [The victim] was the only one that c[a]me over while he was there.

Q. When he was there, you were alone with him, right?

A. And my front door stood open, yes.

Q. Whenever Ron White was over there after you learned that he—or thought he sexually assaulted your friend, you always kept the door open?

A. Yes.

Q. But you let him stay overnight?

A. Yes.

Q. So you weren't really afraid?

A. I didn't feel he was going to hurt me.

Q. Isn't it true that you made up that story about him sexually assaulting your friend to get him in more trouble than he was in?

A. No.

Q. Did you report that sexual assault?

A. No, I was asked not to.

Q. As you sit here today, you are going to tell us today that you weren't afraid of him?

A. I had ways of defending myself.

Q. You weren't afraid for your son?

A. My son never left my sight.

Q. And how are you trained to defend yourself?

A. I have used my fists before.

Q. So you would—

A. And I do know pressure points.

Q. So you've beat people up before, is that what you're saying?

A. No, I've had to defend myself.

Q. Have you fended off sexual assaults before?

A. Excuse me?

Q. Have you fended off sexual assault[s] before?

A. Once.

. . .

Q. But even though you knew Ron White—or you felt that he might have sexually assaulted your friend, you weren't afraid?

A. No.

. . .

Q. And you weren't afraid to have those little girls come over after Ron White had told you that he had—or after Ron White told you that? You say that Ron said that he had asked [the victim] for sex?

A. I had not asked them to come over.

On redirect examination, the prosecutor proceeded as follows:

Q. I guess, since we talked about this sexual assault and your neighbor that was brought up, I am going to ask you about that, about why that didn't intimidate you.

A. Okay.

Q. Your testimony is that after that happened you didn't feel intimidated?

A. I didn't feel that he was going to hurt me. He called me his daughter.

Q. Tell us what happened, who was this person?

A. My best friend, [name].

Q. Where did [she] live?

A. Right across the hall. . . .

Q. These are the two doors that were left open?

A. Yes.

Q. That was done all of the time, before the Defendant was involved, after the Defendant was involved? You just left your door open, correct?

A. Yes.[3]

Q. What did [your neighbor] tell you happened?

A. She told me that he had asked—or she had gotten a back rub from him.

Q. From who?

A. From Ron. And that it proceeded to be a full body rub. And he had kept trying to—

Q. Let me stop you there. When, in relation to September 16, did this happen?

A. I want to say not even a week before the 16th.

Q. So there is no confusion, this was a consensual, as you say, body rub?

A. Yes.

Q. Go from there.

A. She had told me that he had continued to try to lick her vagina, and she had told him to stop several times. She told me that he had rubbed his penis on her back, and she had asked him to stop several times. . . .

Q. And [your neighbor], is she an adult?

A. Yes.

Q. Okay. Did you ever put yourself in a position where he was giving you body rubs?

A. No.

The appellant did not object to this testimony at trial.

3. Deputy Walton testified that based on his interviews, it was his understanding that it wasn't uncommon for Bilger and the neighbor to leave

[¶ 11] "This Court has recognized that a defendant may open the door to otherwise inadmissible testimony when he inquires about a particular subject," including evidence of prior criminal misconduct. *Gayler v. State*, 957 P.2d 855, 858 (Wyo.1998); *see also Espinoza v. State*, 969 P.2d 542, 546 (Wyo.1998), *cert. denied*, 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 52 (1999). "When the defendant initiates a line of questioning, the prosecutor is entitled to make a permissible inquiry without crossing into prosecutorial overkill." *Espinoza*, 969 P.2d at 546.

It is usually a basic function of redirect examination to allow a witness to explain his testimony elicited on cross-examination. . . . The opening of the door concept, however, reaches further and is an extension of that familiar rule. Succinctly stated, the "opening the door" rule is that a party who in some way permits the trial judge to let down the gates to a field of inquiry that is not competent but relevant cannot complain if his adversary is also allowed to avail himself of the opening within its scope.

*Sanville v. State*, 593 P.2d 1340, 1344 (Wyo. 1979).

[¶ 12] We conclude that even if Bilger's testimony on redirect examination was otherwise inadmissible, the appellant's trial counsel "opened the door" to that testimony in cross-examining Bilger. It is evident from the cross-examination of Bilger that the appellant's trial counsel sought to utilize the alleged incident to impeach Bilger's testimony that she was not afraid of the appellant despite her claimed knowledge of the incident, establish that Bilger fabricated the alleged incident as part of her plot to "get rid of" the appellant, and emphasize that Bilger's actions were not consistent with her testimony as a whole or her testimony as to the alleged incident. In briefly eliciting the facts underlying the alleged incident relative to why Bilger might not have been afraid of the appellant under the circumstances, the prosecutor's redirect examination did not cross the

their doors open so they "could go back and forth to each other's apartment."

line between permissible inquiry and prosecutorial overkill. *See Espinoza,* 969 P.2d at 546–47; *Gayler,* 957 P.2d at 859; and *Sanville,* 593 P.2d at 1344.

### VICTIM IMPACT TESTIMONY

[¶ 13] The appellant asserts that the prosecutor elicited irrelevant and prejudicial victim impact testimony from Deputy Walton in order to evoke sympathy from the jury. The testimony at issue concerned the victim's demeanor when interacting with Deputy Walton. The State argues that the testimony was relevant in assessing the victim's credibility.[4] Both parties characterize the testimony as victim impact testimony in arguing the issue's merits.

> The key inquiry on the admissibility of victim impact testimony during the guilt phase of a criminal trial is relevancy. *McCone v. State,* 866 P.2d 740, 751 (Wyo. 1993). Victim impact testimony must not be permitted "unless there is a clear justification of relevance." *Justice v. State,* 775 P.2d 1002, 1011 (Wyo.1989). Such testimony may be irrelevant if offered during the guilt phase of the trial as proof of the victim's loss; the physical, emotional, or psychological impact on the victim; or the effect upon the family. Yet, it may be relevant if offered for another proper purpose. *Id.* at 1010 ....
>
> Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. In criminal cases, "[e]vidence is always relevant if it tends to prove or disprove one of the elements of the crime charged." *Grabill v. State,* 621 P.2d 802, 809 (Wyo.1980); *see also Lancaster v. State,* 2002 WY 45, ¶ 42, 43 P.3d 80, ¶ 42 (Wyo.2002); *Geiger v. State,* 859 P.2d 665, 667 (Wyo.1993). Relevant evidence may be excluded, however, if "its probative value is substantially outweighed by the danger of unfair prejudice." W.R.E. 403. For this court to conclude that the trial

court admitted unduly prejudicial evidence in violation of W.R.E. 403, the appellant must demonstrate "that the evidence had little or no probative value and that it was extremely inflammatory or introduced for the purpose of inflaming the jury." *Apodaca v. State,* 627 P.2d 1023, 1027 (Wyo. 1981).

*Wilks v. State,* 2002 WY 100, ¶¶ 8–9, 49 P.3d 975, 981–82 (Wyo.2002).

[¶ 14] In the instant case, the victim testified as the prosecution's first witness. Deputy Walton noted during his subsequent trial testimony that the victim was, at the very least, upset and crying during her trial testimony. The appellant's trial counsel attacked the victim's credibility while cross-examining the victim and Bilger. These attacks were consistent with the appellant's theories that Bilger used the victim and police to "get rid of" the appellant, that the victim's actions after the incident were inconsistent with what would be expected if the circumstances occurred as she alleged, that the victim lied about not knowing the appellant prior to September 16th, and that the victim's testimony was not credible because it conflicted with Bilger's.

[¶ 15] Deputy Walton testified as the last witness during the prosecution's case-in-chief. The testimony at issue arose in the context of Deputy Walton's chronology in investigating the incident. The prosecutor first asked Deputy Walton about a September 17th, telephone call he received from the victim's father, wherein the father called from home to report that the victim had possibly been sexually assaulted and the father had confronted the appellant and "punched him in the nose...." When asked if he could hear any "distinctive background noise" during the telephone call, Deputy Walton replied that the victim "was very upset, crying, even more so than she was this morning [at trial], with sobbing and that type of thing." Deputy Walton admitted on cross-examination that he assumed it was the victim crying in the background during the telephone call and that he had no knowledge

---

4. The State does not argue that the testimony was relevant for any other purpose. The appellant does not argue that Deputy Walton imper-

missibly vouched for the victim's credibility or that consideration of the testimony should have been limited.

that the victim was upset or crying prior to the telephone call.

[¶ 16] Deputy Walton then arranged for the victim, her father, and other witnesses to appear at the sheriff's office for interviews. The following colloquy occurred during the prosecutor's direct examination of Deputy Walton:

Q. Okay. Generally speaking, what was [the victim's] demeanor during the interview?

A. Sobbing and very upset, so much so that she wasn't able to form words. It took a few minutes to get her settled down where she would be able to converse with me where I understood her and she could answer my questions.

. . .

Q. After the September 17 interview, did you talk to [the victim] again about the case?

A. I have talked to her a couple of different times.

Q. What was her general overall demeanor during those times?

A. If it was a short meeting and I wasn't talking to her about something related to the case, she was a jovial, friendly person like I've known her for the years I've known her, what she's like. We will talk about the case and stuff, she would become visibly upset, and a lot of times she would start crying.

The prosecutor referred to this testimony during closing argument as follows:

When you go back and you guys deliberate about this case, I want you to go back and think about [the victim's] testimony. I want you to go back and think about how she looked you in the eye and what she told you and how she explained this.

[Prosecutor reviewed Bilger's testimony.]

You heard the testimony from Deputy Walton, an officer with 15 years experience. He gets the initial call from [the victim's father]. And what can he hear in the background? He could hear a young girl crying hysterically, upset. Why would she be crying? Why was she upset?

He has them come down to the office to interview everybody, begins a second interview with Iva Bilger. . . .

. . .

Now, Deputy Walton also testified about his interview with [the victim] on September 17. And he didn't go into verbatim, every word that was said, he didn't read out of his notes every word that he said but wasn't his testimony consistent? Weren't the things that [the victim] told him on September 17, 2001, consistent with what she told you yesterday? Has [the victim's] story ever changed in any of this?

Deputy Walton also testified that when he interviewed [the victim] that night, she was hysterical. She was having a difficult time settling down enough to even talk to him. But not just that night, he said he did some follow up investigations, went and saw her again at later times, and she was still having a difficult time dealing with this.

[Prosecutor reviewed Deputy Walton's testimony regarding his interview of the appellant.]

The appellant did not object to Deputy Walton's testimony, or the referenced portion of the prosecutor's closing argument, at trial.

[¶ 17] We have previously held that it was not error, "plain or otherwise," to utilize claimed victim impact testimony to bolster the credibility of a witness after an attack upon that witness' credibility. *Barnes v. State*, 858 P.2d 522, 533–35 (Wyo.1993). Barnes was convicted of second-degree murder and first-degree arson in the beating death of his girlfriend's five-year-old daughter and subsequent setting of a fire to conceal the crime. *Id.* at 524. In addressing an issue as to whether a police officer who interviewed the girlfriend impermissibly vouched for her credibility in testifying about the girlfriend's physical and mental appearance during the interview, we stated that an understanding of the girlfriend's "appearance, physical and mental condition, and sobriety would be important to explain her inconsistent statements and determine the weight to be given her testimony." *Id.* at 530. *See generally also Whiteplume v. State*, 841 P.2d 1332, 1341–42 (Wyo.1992).

[¶ 18] Barnes also questioned the relevance of claimed victim impact testimony by the girlfriend:

> During cross-examination, [the girlfriend's] credibility was repeatedly and vigorously attacked. She was asked many times why she did not look at defense counsel, why she did not look at Barnes, why she did not look members of the jury in the eye when she spoke. In closing argument, defense [counsel] repeatedly attacked her credibility by calling her a liar.

*Barnes,* 858 P.2d at 534. The following occurred on redirect examination:

> Q. Natalie, throughout these days of Tuesday, and even up to now, you've been kind of distracted by something. Have you had something in your hand?
>
> A. Yes, I have.
>
> Q. What is that?
>
> A. It's a picture of [the victim.]

*Id.* at 533. During rebuttal closing argument, the prosecutor argued:

> "You recall when she was on the stand. She was constantly distracted. She was accused by defense counsel of not looking people in the eye, not wanting to face you. When it comes out that she is looking at the only remnant she has left of her family now, and that's that soiled picture of little Brandy Jo. That's all she had remaining. Very little if anything left for this lady."

*Id.* Barnes did not object at trial.

[¶ 19] In evaluating the relevancy of the testimony at issue in *Barnes,* we stated that the credibility

of witnesses is always a question of fact for the trier of fact to determine. *La Vigne v. Commw.,* 353 S.W.2d 376, 378–79 (Ky. 1962). Witness credibility is subjective and may be affected by personal appearance, the perception of others, credibility of other witnesses, the theory of the case, the theme of the case, the order of witnesses and the character of the jury. 81 Am.Jur.2d *Witnesses* § 1027, p. 840 *citing* Purver, Young, Davis, and Kerper, *The Trial Lawyer's Book: Preparing and Winning Cases* (1990), § 11.3.

"The credibility of a witness may be attacked by any party, including the party calling him."

W.R.E. 607. A corollary to the rule allowing a party to attack the credibility of a witness is to permit the opposing party to bolster that credibility. Thus it has been held that:

> "Thus, the credibility of a witness does not have to have been the subject of attack before it can be bolstered as was traditionally required in past.... The party calling a witness may thus attempt to support credibility through direct or redirect examination and through the introduction of extrinsic evidence...."

*State v. Frost,* 242 N.J.Super. 601, 577 A.2d 1282, 1288 (1990).

*Barnes,* 858 P.2d at 534. We concluded that there was no error "in presenting this evidence, plain or otherwise," because the "evidence was relevant as bolstering the credibility of the witness after an attack upon that credibility." *Id.* at 534–35.

■■■ [¶ 20] We similarly conclude that, under the circumstances of the instant case, the referenced testimony was relevant to bolster the victim's credibility. Deputy Walton testified, without objection, to the contents of his interview with the victim. Just as consistencies in the information the victim provided Deputy Walton prior to trial were probative in evaluating the information the victim provided during her trial testimony, consistencies in the victim's demeanor when providing that information and to some degree at other stages of the case were, considering the appellant's attacks on the victim's credibility, probative in evaluating the victim's testimony and demeanor at trial. Defense counsel's own closing argument further illustrates the relevance of such testimony in the instant case. During that argument, he attacked the victim's credibility based on the victim's demeanor while testifying, arguing that the victim's "total transformation" from "sobbing and crying" and difficulty "even communicating" with the jury on direct examination to an "almost combative" witness trying to "fight" with him on cross-examination were indicative of the larger claimed inconsisten-

cies between her actions and substantive testimony.[5]

[¶ 21] The testimony at issue was relatively brief and was not extremely inflammatory or introduced for the purpose of inflaming the jury. Neither the testimony nor the argument based on that testimony was calculated to arouse the passions of the jury. We remain mindful that trial courts should not "permit [victim impact] evidence ... unless there is a clear justification of relevance" and will continue carefully to review the admission of such evidence according to the particular facts of each case. *Justice v. State*, 775 P.2d 1002, 1011 (Wyo.1989).

[¶ 22] The prosecutor did elicit some related testimony that, even if probative of the extent of the victim's emotional state during her interview with Deputy Walton, arguably risked the danger of unfair prejudice. Deputy Walton re-interviewed the victim September 17th, having developed "some concerns about [the victim's] mental being that [he] wanted to discuss...." Some of Deputy Walton's follow-up with the victim was due to "her mental status and concerns for her safety." The prosecutor proceeded as follows based on that testimony:

Q. What concerns for her safety?

A. There w[ere] concerns for her safety that she might hurt herself in some way or kill herself.

Q. Why?

A. She had commented about that. If I remember correctly, her counselor had also talked with the parents and warned

them that she's not dealing with this too well.

The appellant did not object to this testimony.

[¶ 23] We cannot say that, based on our review of the record, a reasonable possibility exists that in the absence of this testimony the verdict might have been more favorable to the appellant. Deputy Walton's testimony as a whole was clearly relevant despite these potentially erroneous questions and answers. *See Wilks*, 2002 WY 100, ¶ 16, 49 P.3d at 984 and *Taul v. State*, 862 P.2d 649, 656 (Wyo. 1993) (holding certain answers by the victim amounted to irrelevant victim impact testimony; however, the testimony was harmless because, as a whole, it was clearly relevant). Further, the prosecutor did not specifically refer to this brief testimony during closing argument or otherwise emphasize the testimony, and the district court instructed the jury that, in determining the credibility of the witnesses, it should not be influenced

by pity for or passion or prejudice against any of the litigants in this case. The law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. The litigants have the right to demand and expect that you will conscientiously and dispassionately consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict....

### CLOSING ARGUMENT

[¶ 24] The appellant contends that the prosecutor committed misconduct during closing argument by shifting the burden of

---

5. The appellant's trial counsel presented the following argument during his closing:

Now, they also had [the victim] on the stand yesterday. And, you know, it appeared that she was terrified, that she was sobbing almost uncontrollably. And if you take as true, what she said happened that day, it's understandable. Who would even want to be in the same town with somebody who had done those atrocious things, said that terrible stuff to her. Who wouldn't be that afraid, especially a young person who is, as most young people are, you know, it's hard to defend against a big person like that.
...
Yes, when [the victim] came and got on the stand and was sobbing and crying and having trouble even communicating with you, it was

traumatic and understandable if that had really happened to them, it would be traumatic. But when she got up there for cross-examination, there was a total transformation. There was no sobbing, crying. In fact, she was almost combative with my questions. She was trying to fight with me when I asked her questions.

That's not unusual, that happens. But the total transformation from somebody who is almost at a breakdown to a little while later no crying at all, that is inconsistent, too. There are some possibilities on how that could happen, but it doesn't just—given all of the other things that have happened along with it, all of her actions that are inconsistent with somebody who is totally terrified, that has to be looked at, too.

proof from the State to the appellant. In that regard, a "basic premise in our criminal law is that the burden of proof rests upon the state and never shifts." *Lane v. State,* 12 P.3d 1057, 1066 (Wyo.2000).

[¶ 25] Trial testimony indicated that a female juvenile, BB, was present with Bilger, the victim, and the appellant during events that occurred after the victim's September 16th encounter with the appellant. On cross-examination, the victim denied meeting the appellant with BB at Bilger's residence the day prior to that encounter and denied that BB knew the appellant prior to the encounter. Deputy Walton later testified on cross-examination that when he interviewed BB, she said that she had actually met the appellant on September 15th. The appellant's trial counsel insinuated that the victim, too, had met the appellant with BB on September 15th. BB did not testify at trial.

[¶ 26] The appellant's trial counsel argued the following during his closing argument:

> Maybe one of the reasons [Bilger and the victim] keep getting together is so there is more and more and more information that they can say happened. They have [B.B.] there to confirm that he was there and she was there. But where is [B.B.]? She supposedly could corroborate some of this stuff. She's not here. The reason she's not here is because some of her statements just don't jive with what they're telling you.

The prosecutor responded as follows during his rebuttal closing argument:

> They mention that [B.B.] is not here. True, she wasn't here. Did they bring her in? They could have put her on as a witness. It's not our duty to bring everybody.

The appellant did not object to this argument at trial.

[¶ 27] Generally, " 'where a witness is equally available to both parties, the failure to call the witness is not the proper subject of comment.' " *Fortner v. State,* 835 P.2d 1155, 1157 (Wyo.1992) (*quoting King v. State,* 780 P.2d 943, 953 (Wyo.1989)). In *Fort-*

*ner,* 835 P.2d at 1158 (emphasis in original), we stated the following:

> In any case, the prosecutor made the statements about appellant's failure to call witnesses in response to appellant's argument that the *State* had not called those same witnesses. The inference was that the witnesses would have been unfavorable to the State. Once appellant "opened the door" by commenting on the State's failure to call the witnesses, he allowed the prosecution to close that same door. *See Sanville v. State,* 593 P.2d 1340 (Wyo.1979) (discussing the "opening of the door" rule). The State merely pointed out that the witnesses were equally available to appellant and that he could have called them if they were unfavorable to the State. We hold that the trial court did not impermissibly shift the burden of proof or deride the presumption of innocence by allowing the State to make the challenged comments.

The context of the prosecutor's argument in the instant case is nearly identical to that of the prosecutor's argument in *Fortner,* and we therefore find no error as to this issue.

[¶ 28] The appellant also argues that the prosecutor personally vouched for Bilger's credibility during his rebuttal closing argument. Closing arguments

> must be based upon the evidence submitted to the jury. The purpose of closing argument is to allow counsel to offer ways of viewing the significance of the evidence. *Hopkinson v. State,* 632 P.2d 79, 145 (Wyo. 1981). Prosecutors, just like defense counsel, may review the evidence and suggest to the jury inferences based thereon. . . . There are limits, however, on prosecutor's closing arguments that are designed to insure the fairness of the trial and prevent compromise of the judicial system.

*Dysthe v. State,* 2003 WY 20, ¶ 24, 63 P.3d 875, 884–85 (Wyo.2003). The " 'propriety of any comment within a closing argument is measured in the context of the entire argument.' " *Mazurek,* 10 P.3d at 542 (*quoting English,* 982 P.2d at 143).

It is improper for the prosecuting attorney, even in responding to defense arguments, to personally vouch for the credibil-

ity of the state's witnesses. *Harper v. State*, 970 P.2d 400, 403 (Wyo.1998). In *Barela [v. State*, 787 P.2d 82, 83–84 (Wyo. 1990)], we stated the rationale for this rule:

> "When the prosecutor asserts his credibility or personal belief, an additional factor is injected into the case. This additional factor is that counsel may be perceived by the jury as an authority whose opinion carries greater weight than their own opinion: that members of the jury might be persuaded not by the evidence, but rather by a perception that counsel's opinions are correct because of his position as prosecutor, an important state official entrusted with enforcing the criminal laws of a sovereign state. While the prosecutor is expected to be an advocate, he may not exploit his position to induce a jury to disregard the evidence or misapply the law."

*Lane*, 12 P.3d at 1065.

[¶ 29] The appellant's trial counsel devoted much of his closing argument to assailing Bilger's testimony. He argued that Bilger used the victim and the police to "get rid of" the appellant, that Bilger's testimony contradicted the victim's testimony in some respects, and that Bilger was not credible because her actions were "inconsistent with what a normal person might be doing" if the circumstances occurred as she and the victim alleged. The prosecutor responded in his rebuttal closing argument as follows:

> There is some talk about Iva Bilger, she just doesn't quite act the way the rest of us act. Well, okay, I said that before, I agree. It's a woman who sleeps at night who leaves her door open because she feels safer. It's a little different. Does that mean she's not believable?
>
> She got up there and told you what happened, and she was honest. There was things that were contradictory to [the victim's] story. She didn't have a problem contradicting [the victim.] [Appellant's trial counsel] asked her and said [the victim] said so and so called her up. He said, are you sure? [The victim] says you called her up to the apartment the first time. No, I

don't think that was me, she said. Are you sure? Yeah.

> Then when it came to contradicting the other side of the story, she told you.

The appellant did not object to this argument at trial.

[¶ 30] The appellant cites *Dysthe* to support his argument. In *Dysthe*, 2003 WY 20, ¶ 28, 63 P.3d at 886, the prosecutor argued as follows:

> "These witnesses, despite the fact that they are users, were credible. They were very credible. They were more credible because of the very fact that they have a relationship with this Defendant. More credible because, if you couldn't tell, I certainly could; they didn't like me asking them questions. They didn't want to be telling me anything."

The prosecutor in *Dysthe* further argued that he had worked with investigators on the case and could "guarantee" that their investigations were not "arbitrary" and that the witnesses "had no reason to lie." *Id.* We concluded that while the prosecutor

> did not directly state that it was his opinion that the witnesses were credible, he certainly gave that impression. Further, he did not suggest that the determination was to be made by the jurors; instead, he offered his own observation that the witnesses were "more credible" because "if you couldn't tell, I certainly could [that] they didn't like me asking them questions." And finally, his personal guarantee that the investigation was not arbitrary certainly amounted to a personal attestation of fact.

*Id.*, 2003 WY 20, ¶ 30, 63 P.3d at 886.

[¶ 31] The State cites *Burton* in opposition to the appellant's argument. In *Burton v. State*, 2002 WY 71, ¶ 33, 46 P.3d 309, 317 (Wyo.2002), the prosecutor argued that the State's witnesses " 'were blatantly honest ... about a lot of things. They had to admit they were doing drugs.... That's a hard thing to admit.' " We concluded that the prosecutor's comments were not improper because he

> did not personally vouch for the credibility of the witnesses. The prosecutor was sim-

ply pointing out that the witnesses had been forthright about their drug use notwithstanding the fact that it was difficult to discuss those matters in a public forum. He drew a reasonable inference from the evidence that the witnesses would have no motive to lie by confessing their drug use because use of drugs is illegal and is not accepted by general society. The prosecutor's comment was not improper.

*Id.,* 2002 WY 71, ¶ 35, 46 P.3d at 318.

[¶ 32] We find that the circumstances of the instant case more closely resemble those in *Burton* than in *Dysthe*. In the instant case, the prosecutor did not personally vouch for Bilger's credibility. The prosecutor's comment that Bilger "was honest," when viewed in isolation as opposed to the prosecutor's entire argument, could at most have given the jury that "impression." However, unlike *Dysthe*, the prosecutor in the instant case referred the jury to the district court's instructions previously during his argument and stated that the jury was the exclusive trier of fact, that the jury was to decide whom to believe, and that the jury was to "decide what the facts of this case are and what they are not." Nor was the comment at issue accompanied by any personal attestation of fact. The prosecutor instead proceeded to discuss the actual trial testimony and argued that the jury should infer from the evidence that Bilger was credible because she "didn't have a problem" contradicting the victim's testimony, which inference also undermined to some degree the appellant's allegation that Bilger used the victim to help "get rid of" the appellant.

## CONCLUSION

[¶ 33] The prosecutor did not commit misconduct by eliciting prejudicial victim impact statements, vouching for the credibility of a witness, shifting the burden of proof to the appellant, or eliciting hearsay testimony of a prior bad act without notice to defense counsel. Therefore, we affirm.