2005 WY 93

**Roy Frederick DAVIS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 04–95.

Supreme Court of Wyoming.

Aug. 15, 2005.

Representing Appellant: Ken Koski, Public Defender; Donna D. Domonkos, Appellate Counsel; and Marion Yoder, Senior Assistant Public Defender.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Georgia L. Tibbetts, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] In October 2003, a Natrona County jury found Roy Frederick Davis (the appellant) guilty of four counts of forgery, all felonies in violation of Wyo. Stat. Ann. § 6–3–602(a)(ii) and (b) (LexisNexis 2005). This is an appeal from the district court's judgment and sentence, wherein the appellant alleges several errors. We affirm.

## ISSUES

1. Whether a handwriting expert's testimony prejudiced the appellant to a degree that mandates reversal of his forgery convictions?

2. Whether the prosecutor made improper remarks during her closing and rebuttal arguments?

3. Whether there was sufficient evidence to sustain the appellant's forgery convictions?

4. Whether the district court abused its discretion in denying the appellant's motion for a new trial based on recanted trial witness testimony?

5. Whether the district court abused its discretion in sentencing the appellant?

6. Whether cumulative error mandates reversal of the appellant's forgery convictions?

## FACTS

[¶ 2] The instant case revolves around four people: Thomas "Ted" Dorr (Dorr), Linda Brown (Brown), Rebecca Burton (Burton), and the appellant. At the time of the appellant's trial, Dorr and Brown had been living together for about two and one-half years and Burton and her young son had also periodically lived with Dorr and Brown.[1] Burton is Brown's daughter and was also the appellant's girlfriend (Burton apparently married the appellant in September 2003, but testified at trial that she was the appellant's "girlfriend"). We note, for contextual purposes, that Dorr and Brown testified during the prosecution's case-in-chief at trial, and Burton and the appellant testified during the appellant's case. We will refer to each individual's trial testimony in setting forth the relevant facts.

[¶ 3] On May 31, 2003, Burton and the appellant stopped at Dorr's and Brown's house late in the evening to pick up Burton's son. Brown had previously informed Burton that the appellant was not welcome in the house, but Brown allowed the appellant into the house that evening at Burton's request so that the appellant could use the restroom. Dorr testified that he always kept his wallet containing his credit cards "in plain sight" on a counter located between the living room

---

1. By October 2003, Brown had married another man and was in the process of moving out of the house she shared with Dorr, although she and Dorr remained "friends."

and the kitchen. Burton took the appellant to the restroom's location and the two passed the location of Dorr's wallet on the way to the restroom and again on their return.[2] Neither Dorr nor Brown actually witnessed anyone take anything from Dorr's wallet.

[¶ 4] A Holiday Inn night auditor in Casper testified that on May 31, 2003, the appellant used the name "Dorr" when he signed a hotel registration card to secure a room for the night (the auditor recalled that the appellant verbally spelled the name for her) and paid for the room with a credit card. The hotel registration card listed the customer as "Thomas Dorr" with a Casper address of 975 East 12th Street (Dorr's and Brown's Mountain View address was 542 Harding). The appellant signed the hotel registration card "Ted Dorr" (which signature authorized the hotel to bill the credit card the appellant presented to the night auditor).

[¶ 5] Casper Wal–Mart receipts indicate that at about 10:21 a.m. on June 1, 2003, someone used a Visa credit card (last four digits of the account number 0269) to purchase $163.92 in merchandise (including what appear to have been boys clothing, female underwear, and a pair of boots). The purchase receipt was signed "Thomas Dorr." Natrona County Sheriff's Deputy Chris Poldervaart testified that he viewed a Wal–Mart security video of this transaction, in which video he observed: (1) Burton, her son, and the appellant checking out of the store; (2) their items being placed on the checkstand; (3) the appellant removing a credit card from his wallet, swiping the credit card at the checkstand, placing the credit card back into his wallet, and signing the credit card transaction slip; and (4) the three individuals leaving the store.

[¶ 6] A Casper JC Penney store receipt indicates that at 11:03 a.m. on June 1, 2003, someone used a Visa credit card (last four digits of the account number 0269) to purchase $137.73 in merchandise. The receipt

was signed "Ted Dorr." A store employee testified that the appellant purchased some clothing (including an adult pair of pants) that day, paid for the items with a credit card bearing the name "Thomas Dorr," and signed the credit card receipt "Ted Dorr."

[¶ 7] A Casper Target store receipt indicates that at 11:15 a.m. on June 1, 2003, someone used a Visa credit card (last four digits of the account number 0269) to purchase $37.79 in designer fragrances. The receipt was signed "Thomas Dorr." Deputy Poldervaart testified that he viewed a Target security video, in which video he observed the appellant, Burton and Burton's son approach a checkout register, as well as the presentation of a credit card.

[¶ 8] The aforementioned account number is that of Dorr's "Camping World" MBNA Visa credit card bearing the name Thomas E. Dorr. Dorr testified that he did not believe that he used this credit card on May 31st, that he did not use this credit card on June 1st or on June 2nd, and that he did not incur the charges at the Holiday Inn, Wal–Mart, JC Penney, or Target. Dorr testified that he had never given anyone permission to use this particular credit card, that he did not give Burton or the appellant permission to use the credit card, and that Burton did not ask Dorr's permission to use the credit card on May 31st.

[¶ 9] On June 2, 2003, Burton called Brown. Dorr testified that Burton told Brown that the appellant had stolen Dorr's credit card; Brown testified that based on the telephone call, she knew that the appellant "had the credit card. . . ." Brown then arranged to meet Burton at a local convenience store. At the convenience store, Burton exited her vehicle (the appellant remained in Burton's vehicle) and entered the vehicle containing Dorr and Brown. According to Dorr and Brown, Burton handed Dorr his credit card[3] and stated that the appellant

---

**2.** Dorr testified that he was in his computer room at the time, and Burton and the appellant passed by him on their way to the restroom.

**3.** Dorr testified that he does not normally sign the back of his credit cards and that he thought that he had written "see ID" on the back of this

particular credit card. The signature line of the credit card Burton handed Dorr had been "completely scratched off" and was not in the same condition as it had been when the card was last in Dorr's possession.

had stolen the credit card and also that Burton had not used the credit card.

[¶ 10] Dorr wanted to report the theft to law enforcement, and Brown testified that she told Burton that Brown was calling 911 and Burton needed to take the appellant to the police department immediately. When the four individuals arrived at the police station, the appellant exited Burton's vehicle and left the area on foot.[4] Law enforcement advised Dorr to cancel his credit card; Dorr did so and was immediately issued a new credit card account number. Dorr received a letter a few days later issuing him a new personal identification number (PIN) for the credit card account number he had canceled. The credit card company informed Dorr that a man who identified himself as Dorr had requested a new PIN for that credit card account number on June 1, 2003. Dorr testified that he did not request the new PIN.

[¶ 11] Deputy Poldervaart began investigating the case and met with the appellant on June 5, 2003. At that time, the appellant denied that he stole Dorr's credit card, denied that he entered the Holiday Inn (he waited in the car), and admitted that he was present for the transactions at Wal–Mart, JC Penney, and Target.[5] In a subsequent interview, the appellant initially denied using Dorr's credit card (particularly at Wal–Mart), but when Deputy Poldervaart informed the appellant of the Wal–Mart security video, the appellant reportedly admitted that he signed the credit card receipts at Target, Wal–Mart, and JC Penney. The appellant denied that he entered Dorr's and Brown's house on May 31st and continued to

deny that he used Dorr's credit card at the Holiday Inn.

[¶ 12] Deputy Poldervaart also met with Burton. At first, Burton said that she did not sign the credit card receipts at issue because she did not know that they were using Dorr's credit card. Burton stated at another time that she (and not the appellant) took Dorr's credit card, with Dorr's permission. Deputy Poldervaart also testified that he learned that as a result of discussions between Burton and the appellant, Burton was willing to "take a misdemeanor charge for the theft of the card and state that she told [the appellant] that she had permission which could eliminate [the appellant's criminal] charges" because the "penalty would be less for her than it would be for [the appellant]."[6]

[¶ 13] Burton provided her own version of these events during her trial testimony. On May 30, 2003, she asked Brown for money to purchase clothing for Burton, her son, and the appellant on June 1st. According to Burton, Dorr offered to give Burton his credit card for that purpose. On May 31st at about 11:45 p.m., Burton retrieved her son from Dorr's and Brown's house and began to drive back to Douglas. Burton returned to the house because she had forgotten to print off a resumé on Brown's computer. When they arrived at the house, the appellant needed to use the restroom and Brown granted the appellant permission to enter the house for that purpose. Burton and the appellant passed Dorr on the way to the restroom, and Burton returned to Brown's location to print the resumé. The appellant rejoined Burton and Brown, and Dorr was "right behind" the appellant.[7]

---

**4.** The appellant testified that Burton told him that "it didn't pertain" to the appellant, so the appellant left to price a bus ticket to Ohio so that he could visit a sick relative.

**5.** The appellant testified that he did not deny entering the Holiday Inn or signing the credit card receipt at the Holiday Inn. There is some indication in the record that the appellant testified at the preliminary hearing in this matter that he denied that he "signed anything at the Holiday Inn" when speaking with Deputy Poldervaart.

**6.** Burton testified that she gave Deputy Poldervaart "substantially different" statements that

were not under oath because he threatened to "make sure that [Burton] would spend five years in Lusk" and because Dorr threatened Burton. Dorr testified that he did not threaten to take Burton's son away from her and that he did not "believe" that he threatened to have Burton arrested for the use of his credit card. Brown testified that she never threatened to have Burton arrested for the use of Dorr's credit card because Burton stated that she did not use the credit card. However, Brown had told Burton at some point that Burton's son would be taken from her if she did not "straighten up...."

**7.** According to Burton, Dorr drinks "every day" and had been drinking that day.

[¶ 14] According to Burton, Brown suggested that due to the late hour of the day and the fact that Dorr had already agreed to give Burton his credit card the next day, Burton should take Dorr's credit card immediately and stay at a hotel in Casper rather than drive back to Douglas. Dorr directed Burton to his wallet's location and instructed Burton to retrieve the "Camping World" credit card from the wallet.[8] Burton told the appellant that she had permission to use Dorr's credit card and they went to the Holiday Inn in Casper. The appellant used Dorr's credit card to obtain a room at the Holiday Inn because Burton thought it best that a male sign Dorr's name when using the credit card due to past signature problems she had experienced in attempting to use Dorr's credit cards. The appellant then proceeded to use Dorr's credit card to purchase items for Burton, Burton's son, and the appellant at Wal–Mart, JC Penney, and Target.

[¶ 15] Burton further testified that Dorr had previously allowed her to use his credit cards (although not the credit card at issue in the instant case) six or seven times and that she told the appellant that she had the authority to use Dorr's credit cards. For example, in January 2003, Dorr gave Burton a credit card to purchase a tire for Burton's car; the merchant would not allow Burton to use the credit card and Dorr came to the merchant personally to sign for the transaction. In April 2003, Dorr gave Burton a credit card to pay for a hotel room at the Casper Hearthside Inn; the hotel would not accept the credit card because neither Burton nor the appellant's name was on the card, so Dorr came to the hotel personally to sign for the transaction. According to Burton, Dorr also gave her (and the man she was dating at the time) a credit card to use during a trip to Ohio.[9]

[¶ 16] The appellant, who had prior felony convictions for obtaining money by check

fraud and providing a false statement on a loan application, testified that he did not steal Dorr's credit card. Burton took the credit card and told the appellant that she did so with Dorr's permission. The appellant admitted that he then used Dorr's credit card at the Holiday Inn, Wal–Mart, JC Penney, and Target; the appellant signed the credit card receipts at these locations because he thought he had permission to do so and Burton wanted him to do so because of his gender. The appellant also claimed to have been present when Dorr had previously permitted Burton to use Dorr's credit cards, but acknowledged that Dorr never personally gave the appellant permission to use Dorr's credit cards.

[¶ 17] The appellant was ultimately charged with four counts of forgery, all felonies, in violation of Wyo. Stat. Ann. § 6–3–602(a)(ii) and (b). In October 2003, a jury found the appellant guilty of all four counts. The district court sentenced the appellant to serve five to eight years in prison for each conviction, the sentences to run concurrently. The appellant now appeals from the district court's judgment and sentence.

## DISCUSSION

### *Expert Witness Testimony*

[¶ 18] The appellant claims that the district court abused its discretion in admitting the expert trial testimony of Chris Reed (Reed), a self-described "document examiner...." In particular, according to the appellant, Reed lacked the training and experience to qualify as an expert witness and to offer her expert opinion as to whether the appellant executed the credit card documents at issue. The appellant objected to Reed's testimony at trial; however, the district court (citing our opinion in *Williams v. State*, 2002 WY 184, 60 P.3d 151 (Wyo.2002)) ultimately

---

**8.** Burton also signed an affidavit on July 7, 2003, for the appellant's trial counsel stating that she took the credit card from Dorr's wallet with his express permission.

**9.** Dorr testified that in May he allowed Burton to use a different credit card for "basic emergencies" when Burton needed to take a trip to retrieve her car in Ohio. Dorr believed that the appellant used Dorr's credit card on that trip, without Dorr's permission. Burton testified that another male (not the appellant) used Dorr's credit card on the trip with Dorr's express permission. Dorr also acknowledged that he purchased a tire for Burton with a credit card, but that he did not give Burton permission to use the credit card.

allowed Reed to testify as a "trained handwriting expert analyst. . . ." Reed proceeded to testify that she compared several "question" documents (credit card receipts from the Holiday Inn,[10] Wal–Mart, JC Penney, and Target) with known handwriting samples obtained from Dorr, Burton, and the appellant. Reed concluded that, based on these comparisons, it was "highly probable" that the appellant executed the Wal–Mart, JC Penney, and Target receipts and that the appellant "probably" executed the Holiday Inn receipt.

[¶ 19] We typically review "matters pertaining to the admission of testimony of expert witnesses" for an abuse of discretion. *Id.* at ¶ 5, 60 P.3d at 153–54. However, we need not address the specifics of Reed's testimony or the district court's ruling in great detail because even if we were to assume, for purposes of this appeal, that the district court erred in admitting Reed's testimony, the appellant has not demonstrated that he was prejudiced by such testimony to a degree that would require a reversal of his convictions. An error

> must be "injurious or prejudicial" to warrant a reversal, and it is the burden of the party appealing to establish the injurious or prejudicial nature of the error. *Spilman v. State*, 633 P.2d 183 (Wyo.1981). We have said that for an error to be regarded as harmful, there must be a reasonable possibility that in the absence of the error, the verdict might have been more favorable to the defendant. *Roderick v. State*, 858 P.2d 538, 550 (Wyo.1993): *White v. State*, 2003 WY 163, ¶ 7, 80 P.3d 642, ¶ 7 (Wyo.2003).

*Condra v. State*, 2004 WY 131, ¶ 29, 100 P.3d 386, 394 (Wyo.2004). *See also Skinner v. State*, 2001 WY 102, ¶ 25, 33 P.3d 758, 766–67 (Wyo.2001), *cert. denied*, 535 U.S. 994, 122 S.Ct. 1554, 152 L.Ed.2d 477 (2002).

[¶ 20] Reed's testimony only encompassed whether the appellant executed the credit card documents at issue. We have

previously set forth the overwhelming evidence that the appellant executed these documents (including the appellant's own trial testimony that he did so), and the appellant did not dispute that he executed such documents at trial. The appellant's trial counsel stated in her opening statement that the appellant "has never said that he didn't do these things—he did sign for the hotel room at the Holiday Inn" and further: "So you need to know every time [the appellant] signed that credit card, we offer to stipulate to that. He signed for this credit card; he did get items; and [Burton] got some items." The appellant's trial counsel similarly stated the following during her closing argument:

> So what evidence did you see or hear? Well, we talked all about these credit card receipts and people deciding who signed what. That's uncontradicted. [The appellant] signed the credit card receipts; so you've got that element. He did it; he said he did it. We don't need all that stuff. You already know that. So you can review those all you want. That's a done deal. He signed them.

[¶ 21] Clearly, admission of Reed's testimony did not prejudice the appellant, and reversal of his convictions is not appropriate on that basis.

### Closing Argument

[¶ 22] The appellant asserts that during the State's closing argument, the prosecutor misstated key facts to the jury, improperly personalized her argument, improperly commented on, or vouched for, the credibility of trial witnesses, and implied that the appellant's testimony was not credible simply because he had been charged with crimes in the instant case.

[¶ 23] We review allegations of prosecutorial misconduct " 'by reference to the entire record. . . .' " *Mazurek v. State*, 10 P.3d 531, 542 (Wyo.2000) (*quoting English v. State*, 982 P.2d 139, 143 (Wyo.1999)). Such allegations " 'hinge on whether a defendant's

---

10. The appellant claims that the Holiday Inn receipt was never admitted into evidence. However, the record reveals that the Holiday Inn receipt, or an identical copy thereof, was admitted into evidence (without objection) as State's Exhibit 1 during the testimony of Holiday Inn night auditor Amanda Albertson. Reed referred to a separate copy of that receipt labeled State's Exhibit 7 during her testimony. Exhibit 7 apparently was not admitted into evidence.

case has been so prejudiced as to constitute denial of a fair trial.' " *Id.*

Prosecutorial misconduct "has always been condemned in this state." *Valerio v. State,* 527 P.2d 154, 156 (Wyo.1974). Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error ... affected the accused's "substantial rights." The accused's right to a fair trial is a substantial right. Wyo. Const. art. 1, §§ 6, 9, and 10; *and see, e.g., Jones v. State,* 580 P.2d 1150, 1154 (Wyo.1978). Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused. *Jones v. State,* 735 P.2d 699, 703 (Wyo.1987). We read this standard to be in consonance with the standard followed by the United States Supreme Court[.]

*Earll v. State,* 2001 WY 66, ¶ 9, 29 P.3d 787, 789–90 (Wyo.2001). *See also Lancaster v. State,* 2002 WY 45, ¶ 31, 43 P.3d 80, 93–94 (Wyo.2002).

[¶ 24] The appellant bears the burden of establishing prosecutorial misconduct. *Id.* at ¶ 32, 43 P.3d at 94. Because the appellant did not object to the alleged incidents of misconduct at trial, "it is incumbent upon him to demonstrate plain error" in that "the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right." *Condra,* 2004 WY 131, ¶ 6, 100 P.3d at 389; *Compton v. State,* 931 P.2d 936, 939 (Wyo.1997).

[¶ 25] Closing arguments must be based upon the evidence submitted to the jury. The purpose of closing argument is to allow counsel to offer ways of viewing the significance of the evidence. *Hopkinson v. State,* 632 P.2d 79, 145 (Wyo. 1981). Prosecutors, just like defense counsel, may review the evidence and suggest to the jury inferences based thereon . . . .

There are limits, however, on prosecutor's closing arguments that are designed to insure the fairness of the trial and prevent compromise of the judicial system.

*Dysthe v. State,* 2003 WY 20, ¶ 24, 63 P.3d 875, 884–85 (Wyo.2003). In *Wilks v. State,* 2002 WY 100, ¶ 27, 49 P.3d 975, 986–87 (Wyo. 2002) (*quoting* I A.B.A., Standards for Criminal Justice 3–5.8 at 3.87 to 3.88 (2d ed.1980)), we stated:

In *Trujillo v. State,* 2002 WY 51, ¶ 5, 44 P.3d 22, ¶ 5 (Wyo.2002), this court set forth the following broad guidelines found in the Standards for Criminal Justice which are applicable to a prosecutor's arguments to a jury:

"(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds."

[¶ 26] The appellant claims that the prosecutor misstated three "key facts" to the jury. First, the prosecutor argued that Reed "determined that it's a high degree of probability that [the appellant] did sign that credit card receipt at the Holiday Inn," but Reed actually testified that she had "lowered" her opinion "a level" from "highly probable" to "probably." It does not appear from the context of the prosecutor's argument that

this was an attempt intentionally to misstate the evidence or mislead the jury and the appellant has not demonstrated that he was prejudiced by the prosecutor's argument because he admitted during his own trial testimony that he signed the credit card receipt at the Holiday Inn in Casper.

[¶ 27] Second, the prosecutor argued as follows:

> And the other store was the Wal–Mart store. We heard testimony that Mr. Dorr's credit card was used at the Wal–Mart store on June 1, 2003. We had testimony of a video which showed Mr. Davis in the checkout line.
>
> [Appellant's trial counsel]: Objection, Your Honor. We didn't see a video.
>
> [The district court]: Counsel, I'm going to limit your argument to what evidence was introduced.
>
> [Prosecutor]: We had testimony that a video was viewed. And through that video, we were told that Mr. Davis was seen in the checkout line. He pulls out of his wallet a credit card, and he pulls out the credit card and signs the receipt.
>
> We heard testimony that that was the receipt signed and the name on there shows Thomas Dorr's signature. From the video and from the receipts, the date and the time are the same. That came from testimony of viewing the video. So clearly Mr. Dorr's credit card was used at Wal–Mart.

The appellant claims that this argument was improperly based on "some unadmitted video" and therefore lacked evidentiary support in the record. However, the prosecutor's argument clearly was not improper because it accurately conveyed Deputy Poldervaart's testimony as to what he viewed on the Wal–Mart security video. The appellant did not object to this witness testimony at trial and has not raised any issue with respect to such testimony on appeal.

[¶ 28] Third, during her rebuttal argument, the prosecutor referred to trial witness "Westfall" in discussing a photo lineup identification of the appellant when it was actually witness "Albertson" who testified in that regard. Yet, it was the appellant's trial counsel who first referred (inaccurately) to witness "Westfall" during her closing argument. The prosecutor merely followed suit in responding to the appellant's argument during her rebuttal argument and the appellant does not claim that the prosecutor misstated the substance of the trial testimony at issue. Needless to say, we find no error here.

[¶ 29] The appellant next asserts that the emphasized remarks contained in the following excerpts of the prosecutor's closing argument were improper because the prosecutor personalized her argument, commented on, or vouched for, the credibility of trial witnesses, and implied that the appellant's testimony was not credible simply because he had been charged with crimes in the instant case.[11] In arguing the merits of the appellant's defense and the credibility of each of the primary trial witnesses, the prosecutor stated the following:

> When you apply that theory to the facts of this case, you have to ask yourself, does that make sense? Ms. Burton testified in this case that she told Mr. Davis it's probably better to sign as "Thomas Dorr." So Mr. Davis did sign the receipts as "Thomas" or "Ted Dorr." Why would she do that? Why did he do that? *If he truly believed he had permission* to use Thomas Dorr's credit card, he could have signed his name to it. *And if he truly believed he had permission* and if, for some reason, the cashiers or the clerks did not accept that credit card because he was not Thomas Dorr, worst case scenario, he would call Mr. Dorr to sign the receipt and get what they wanted. And that did not happen because permission was never given.
>
> Once again, you have the burden to evaluate which story makes sense. And it's your burden to determine which story is more likely to be correct.
>
> * * *

---

11. We have omitted some of the excerpts referenced in the appellant's appellate brief because we are unable to discern the basis upon which they were objectionable.

You need to ask yourself, did Mr. Davis honestly and reasonably believe he had permission to use Mr. Dorr's credit card.

We heard testimony from Mr. Dorr and Ms. Brown that Mr. Davis was not welcome in that house; he had not been welcome in that house. You heard testimony from Ms. Burton that Mr. Davis was not welcome in their house. You heard testimony from the defendant, Mr. Davis; he knew he was not welcome in Ted Dorr and Linda Brown's house. The defendant knew that. The defendant knew, pursuant to his testimony, that Ms. Burton's family did not like him. You heard testimony they had no relationship. They didn't pal around. They didn't do anything.

In fact, you heard testimony that Mr. Davis had to request permission to enter the house to use the rest room. He was not welcome in that house.

*That theory makes no sense.* Somebody he barely knows, somebody who does not let him into his house, somebody he has to ask permission to use the rest room, would give him permission to use his credit card? If believed, generally what that means is anybody could use another's credit card, and when confronted, can say I thought I had permission.

Based upon that information, *Mr. Davis knew he was not right;* he was not allowed in the house; *he did not honestly and reasonably believe he had permission to use that credit card.*

Now you have the opportunity and it's in the jury instructions to look at the credibility of the witnesses. You can look at your life experiences and you can look at their demeanor in the court, their intelligence, their motives. That's open for you to decide who is credible in this case.

And Mr. Dorr, does he have a motive in the case? Possibly. He's a victim. His credit cards—his credit card was used without his permission. Does he have a personal stake in the action? Maybe. *I don't know.* Does he have anything to gain from it? *No.*

Ms. Brown, does she have a motive in the case? She was with Mr. Dorr—she is with Mr. Dorr. His credit card was used without his permission. She's a witness to the action. *Does she have a motive—I don't know—to seek justice?* Does she have anything personally to gain from it? *No.*

You've got Ms. Burton—her motive. Does she have any? Yes. Mr. Davis has been her boyfriend. They still communicate on a regular basis. She has a vested interest in the outcome of this case. Is she biased? Yeah, that is her boyfriend. And with Ms. Burton, let's look at her inconsistent information. She told Detective Poldervaart one story. She told you yesterday that that was a false report, and what she told you yesterday was the truth.

You can decide what's the truth and what's not the truth. The reason she said yesterday she gave a false report was because Mr. Dorr threatened her. Then later on, her story changes because Detective Poldervaart threatened her. Then you heard statements that her mother threatened her.

So Ms. Burton has changed her story *to fit her needs and the needs of Mr. Davis.* You can weigh that when you decide her credibility. And if you decide her testimony is not credible, you don't have to consider it.

Then there's Mr. Davis. *Does Mr. Davis have a motive? Yeah, he does. He's a defendant in this case. He's been charged with four charges.* Does he have a personal stake in the matter? Yes, he does. *Is he biased? Yes, he is. Once again, he is a defendant.*

More importantly, you need to look at Mr. Davis's inconsistent statements. Initially when he met with Detective Poldervaart, he denied everything. Pursuant to testimony from Detective Poldervaart, he denied everything; he wasn't in the house; he had nothing to do with the credit cards; didn't sign anything; he did nothing.

The next time he met with Detective Poldervaart, he changed his story. Well, I didn't sign the Holiday Inn and I didn't go to the house, but I signed Wal-[M]art, Target, and JC Penney.

We had a preliminary hearing in this case. Mr. Davis took the stand; he took an oath. Under oath he told the judge, I was not in the house on May 31st; told the judge, I did not sign the credit card receipt at the Holiday Inn. He did tell the judge, I did sign the receipt at Target, Wal–Mart, and JC Penney.

Yesterday, Mr. Davis takes the stand under oath. He tells you, I did sign the receipt at the Holiday Inn and the JC Penney store and Wal–Mart and Target. And I did go into the house on May 31st. He's changed his story. Do you have to believe him today? What makes you believe him today? He admitted that he did not tell the truth at the preliminary hearing. You get to decide whether he's credible or not on the witness stand.

This is a man, through his testimony, has a high school education and at least three years of college. This is a man who read his Miranda Rights. He read them twice. He was read them twice on two separate days, and he signed them two separate days. So when you go in to decide his credibility, also look at Exhibit 13.

Mr. Davis testified that he's got two prior felony convictions.... And both of those crimes involved crimes of dishonesty. One was obtaining money by fraud; one was false reporting....

Now, you cannot use those convictions to prove that Mr. Davis committed these crimes. You cannot do that. But you can use those convictions to weigh his credibility. You cannot use them to say, he did it before; he'll do it now. But you can certainly look at his credibility and the totality of factors.

And the State argues to you that Mr. Davis did not have permission. Mr. Davis knew what he was doing. He had no permission whatsoever from Mr. Dorr nor from Rebecca Burton.

■ [¶ 30] In the absence of a more particular appellate analysis, or the citation to more pertinent legal authority,[12] we fail to see how the emphasized remarks amounted

to the prosecutorial misconduct claimed by the appellant. Instead, the remarks appear to be the prosecutor's legitimate argument as to what particular inferences the jury should (and should not) make based on the evidence produced at trial, and what evidence and other factors the jury should weigh in evaluating the credibility of Dorr, Brown, Burton, and the appellant. The prosecutor also repeatedly emphasized during her argument that it was the jury's role to decide which theory of the case made the most "sense" based on the evidence and to decide which witnesses were credible.

■ [¶ 31] The only potentially objectionable remark was the prosecutor's argument that the jury should consider whether the appellant had a motive or bias due to his interest in the outcome of the case. However, the appellant has not demonstrated that this remark violated a clear and unequivocal rule of law under the particular circumstances of the instant case. The district court instructed the jury that the jury was "the sole judge of the credibility of the witnesses, and of the weight to be given their testimony" and that the jury "should take into consideration ... the interest, if any, which any witness may have in the outcome of this trial...." The Illinois Supreme Court has stated the following regarding a defendant's interest in the outcome of a criminal case:

> Where, as here, a prosecutor suggests to the members of the jury that a defendant's testimony is biased because he has an interest in the outcome of the case, the prosecutor is not telling them anything they do not know and are not already thinking. The notion that the possibility of conviction may color a defendant's testimony is so basic, so rooted in common experience and human nature, that it would be taken into account by the jurors whether the prosecutor mentioned it or not. When the prosecution makes the point during closing argument, it is merely stating the obvious. The complexion of the case is unchanged.

---

**12.** The remarks at issue in the instant case are not comparable to, and do not rise to the level of, those at issue in the legal authority cited in the appellant's appellate brief.

Defendant contends that a prosecutor's reference to an accused's interest in acquittal is nevertheless improper because of an overriding consideration, the presumption of innocence.[13] We note, however, that assailing a defendant's testimony by pointing out his interest in being acquitted no more erodes the presumption of innocence than any other attempt by the State to prove its case and refute the evidence presented by the defense. The presumption of innocence remains. Arguing bias is merely one means for the State to try to rebut that presumption.

When the defendant contends that the State should not be allowed to argue that he is biased because he has an interest in avoiding conviction, what he is really suggesting is that his testimony should be cloaked with a presumption of veracity. No such presumption exists. As Illinois Pattern Jury Instructions, Criminal, No. 1.02 (3d ed.1992), recognizes, the testimony of a criminal defendant is entitled to no greater deference than the testimony of any other witness. This court made that clear nearly 40 years ago when it expressly held:

> "When a defendant elects to testify in his own behalf, his credibility is to be tested by the usual rules applicable to other witnesses. In determining the credibility of a witness, including a defendant, the jury may take into consideration, among other things, the probability or improbability of the truth of his statements in the light of human experience.... The jury are not entitled to disregard the accused's testimony merely because he is the defendant in the case, but it may consider his interest in the result of the trial in weighing his testimony." *People v. Malmenato*, 14 Ill.2d 52, 59, 150 N.E.2d 806 (1958).

*People v. Barney*, 176 Ill.2d 69, 223 Ill.Dec. 30, 678 N.E.2d 1038, 1040–41 (1997). *See generally also United States v. Larsen*, 525 F.2d 444, 448–49 (10th Cir.1975); *People v. Bunyard*, 45 Cal.3d 1189, 249 Cal.Rptr. 71, 756 P.2d 795, 816–17 (1988); *Walls v. State*, 560 A.2d 1038, 1049 (Del.Supr.), *cert. denied*,

493 U.S. 967, 110 S.Ct. 412, 107 L.Ed.2d 377 (1989); *State v. Apilando*, 79 Hawai'i 128, 900 P.2d 135, 149 (1995); *State v. Googins*, 255 N.W.2d 805, 806 (Minn.1977); *State v. Thompson*, 293 N.C. 713, 239 S.E.2d 465, 469 (1977); and 75A Am.Jur.2d *Trial* § 694 (1991 & Cum.Supp.2005).

[¶ 32] When the prosecutor's argument is viewed in context, it is apparent that the instant case is not one in which the prosecutor suggested that the appellant was guilty solely because he was being prosecuted, but appropriately asked the jury to consider whether the appellant (a trial witness) had a "motive," "personal stake," or "bias" arising from his interest in the outcome of the case. Significantly, after this very brief argument, the prosecutor continued by stating that "[m]ore importantly," the jury should consider the appellant's prior inconsistent statements, prior inconsistent preliminary hearing testimony, and prior felony convictions in evaluating the credibility of his trial testimony.

[¶ 33] The appellant also contends in a one-sentence argument that the prosecutor vouched for Deputy Poldervaart's credibility during her rebuttal argument when she stated that the officer "did ... nothing unethical, nothing illegal" in conducting his investigation. The appellant's trial counsel stated the following during her closing argument:

> You also heard about the testimony of Officer Poldervaart and he conducted this investigation and told you all about that. And he also—you learned a little bit from all the testimony of the other people that were involved that he used some improper tactics and some improper techniques and some force to do this investigation, which is improper.
>
> [Burton] told you on the stand he called her a textbook liar and threatened to throw her in Lusk. That doesn't seem very proper to me. He also interrogated Roy and, of course, their versions of that situation are a little bit different. Roy said he asked for an attorney; Poldervaart said he didn't ask for one. Roy had to talk without an attorney.

---

**13.** The appellant makes no such argument in the instant case.

Further, you remember the testimony of Brittney Westfall. She did a lineup; she was handed a lineup and she told me when I asked her in cross-examination, is this the actual lineup were these names on this—and the names are clearly listed on each of the pictures on there—and she said yes. And Poldervaart said no.

So remember, you're the ones that are to judge who's telling the truth up there and who has had reason to lie and who doesn't and who used proper techniques and who didn't. It's clearly improper to show six pictures with names on them to somebody who is supposed to identify someone on their own.

\* \* \*

[The jury instructions] also discuss for you voluntariness of Mr. Davis's confession. . . . That's for you to look at and you weigh his credibility and you weigh what the law enforcement officer did to get him to say whatever it is he said.

\* \* \*

Remember, too, that if you find there's any inappropriate influence on anybody here, it could be Detective Poldervaart's influence and nobody else's . . . .

[¶ 34] The prosecutor responded as follows during her rebuttal argument:

There's been a lot of statements made regarding investigation techniques. And I want to bring your attention, once again, to State's Exhibit 13. Two separate occasions Detective Poldervaart met with defendant Roy Davis on two separate days, advised him of his rights, he waived those rights. Mr. Davis testified he's a high school educated person. He's got three years of college; he can read, and he can write. He's had two prior contacts with law enforcement that we know of.

Based upon that information, you can decide whether Mr. Davis knowingly waived those rights. You can decide whether Mr. Davis knowingly told the truth to Detective Poldervaart. Plus, he lied under oath. He stated he did at the prelim, he gave one story; yesterday, he gave a different story. You decide his credibility.

You have an officer who's doing an investigation on forgery; he's trying to get all the information. Wouldn't you want him to get all the information? And when you talk to somebody, wouldn't you want him to realize they have a right to talk to counsel? That's what Mr. Poldervaart did; nothing unethical, nothing illegal regarding the photo lineup.

Yes, Ms. Westfall did testify that maybe, yes, she saw the names on the photo lineup. And Mr. Poldervaart testified that, no, he folds it under when he gives it to them. And in this event, if you saw the names on this photo lineup, did you recognize any names? No, she didn't. She was also asked at that photo lineup, did anybody, including Detective Poldervaart, make any statements or suggestions to you on who to pick. She said, no, he didn't. So you can judge the credibility on the photo lineup.

[¶ 35] The appellant's trial counsel clearly opened the door to the prosecutor's argument by questioning Deputy Poldervaart's investigative tactics. "Since [the appellant] opened the door and raised this issue, he cannot now be heard to object when the State properly responds." *Moore v. State,* 2003 WY 153, ¶ 32, 80 P.3d 191, 199 (Wyo.2003). We fail to see how the prosecutor vouched for the officer's credibility in responding to the appellant's argument, especially considering the entire context of the prosecutor's argument, the officer's trial testimony on how he conducted his investigation, and the pertinent jury instructions given by the district court. Both the appellant's trial counsel and the prosecutor also repeatedly noted that it was the jury's role to evaluate the witnesses' credibility.

### Sufficiency of the Evidence

[¶ 36] The appellant argues that the evidence was insufficient to prove that he signed the credit card receipts with the "intent to defraud," or that Dorr did not authorize the appellant to sign the receipts. According to the appellant, Burton told the appellant that they had Dorr's permission to use Dorr's credit card, and the appellant had no reason to believe that he did not have that

authority when he executed the credit card receipts at issue—the appellant executed the receipts because Burton told him that he could do so and because he was male and Burton wanted to avoid having to call Dorr to come and personally sign the receipts. The appellant adds that "there was no question" that Dorr had also granted Burton (and by extension, the appellant) the authority to use his credit cards in the "recent past."

 [¶ 37] Our standard of review on this issue is as follows:

> When reviewing an appeal based on sufficiency of the evidence, we view the evidence, and any applicable inferences based on the evidence, in a light most favorable to the State. *Nixon v. State*, 994 P.2d 324, 329 (Wyo.1999); and *see Pool v. State*, 2001 WY 8, 17 P.3d 1285 (Wyo.2001). In conducting such a review, we do not substitute our judgment for that of the jury; rather, we determine whether a quorum of reasonable and rational individuals would, or even could, have found the essential elements of the crime were proven beyond a reasonable doubt. *Id.*

*McFarlane v. State*, 2001 WY 10, ¶ 4, 17 P.3d 31, 32 (Wyo.2001).

[¶ 38] The district court separately instructed the jury on the elements of forgery for each of the four counts alleged in the charging document. For example, the district court instructed the jury, in pertinent part, as follows with respect to Count I:

### Instruction No. *13*

The elements of the crime of Forgery, as charged in Count I of this case, are:

1. On or about the 1st day of June, 2003,

2. In Natrona County, Wyoming,

3. The Defendant, Roy Frederick Davis,

4. With the intent to defraud,

5. Execute[d], any writing, specifically a credit card receipt at the Holiday Inn, so that it purported to be the act of another, Thomas Dorr, who did not authorize that act.

*See* Wyo. Stat. Ann. § 6–3–602(a)(ii).

 [¶ 39] Our review of the record reveals sufficient evidence, when viewed in a light most favorable to the State, from which a jury reasonably could infer that the appellant executed the credit card receipts at issue without Dorr's authority, and with the requisite intent to defraud. That evidence included the following:

1. The appellant had the opportunity to steal Dorr's credit card the evening of May 31, 2003.

2. Dorr and Brown testified that Burton told them that the appellant stole Dorr's credit card.

3. The appellant used Dorr's credit card to procure a motel room and to purchase other items for himself, Burton, and Burton's son. The appellant signed Dorr's name to the credit card receipts at issue.

4. Dorr testified that he did not give Burton or the appellant permission to use the credit card.

5. Dorr testified that he does not normally sign the back of his credit cards and that he thought that he had written "see ID" on the back of this particular credit card. When Burton returned the credit card to Dorr, the signature line had been "completely scratched off" and was not in the same condition as it had been when the card was last in Dorr's possession.

6. Dorr's credit card company informed Dorr that a man who identified himself as Dorr had requested a new PIN for the credit card at issue on June 1, 2003; Dorr testified that he did not request the new PIN.

 [¶ 40] It is worth noting that a jury may

> find the requisite intent through reasonable inferences from circumstantial evidence. *Lopez v. State*, 788 P.2d 1150, 1153 (Wyo.1990). The rule, as we have expressed it, is that the state of mind of a defendant can be inferred from his acts, his conduct, his words, and other circumstances in the case. *Schiefer v. State*, 774 P.2d 133, 135 (Wyo.1989). If the requisite

intent to defraud could not be inferred from circumstantial evidence, it often would be impossible to establish that intent, because those intent on defrauding others are not likely to tell the victims what their intentions are at the time of the criminal act.

*Henderson v. State,* 976 P.2d 203, 208 (Wyo. 1999).

[¶ 41] The appellant's argument rests primarily on his particular view of his own trial testimony and Burton's trial testimony. To the extent such testimony admittedly conflicted with that given by Dorr and Brown, the jury obviously resolved the resulting credibility issues in favor of Dorr and Brown. "This Court has made it abundantly clear that weighing the credibility of witnesses is the exclusive province of the trier of fact, and we will not substitute our judgment for theirs." *Contreras v. State,* 7 P.3d 917, 921 (Wyo.2000). Further, even "though other inferences may be drawn from the evidence presented, the trier of fact has the responsibility to resolve conflicts in the evidence." *Wetherelt v. State,* 864 P.2d 449, 452 (Wyo.1993).

### *Motion for a New Trial*

[¶ 42] The appellant's trial counsel filed a Motion For New Trial in October 2003, alleging that Burton testified falsely to material facts at trial. The district court held a hearing on the appellant's motion on October 31, 2003, during which hearing the district court heard testimony from Burton and Brown. In an October 13, 2003, sworn statement, and in her testimony at the motion hearing, Burton claimed:

1. That she testified falsely during the appellant's trial;

2. That she stole the credit card from Dorr's wallet without Dorr's permission in the middle of May 2003;

3. That she informed the appellant that Dorr gave her permission to take the credit card and the appellant therefore "had no idea we had no permission to use the credit card"; and

4. That Dorr and Brown testified falsely at trial because Burton informed Brown "right away" (on June 2, 2003) and "several times" thereafter that Burton (and not the appellant) stole Dorr's credit card, because Dorr and Brown told Burton to blame the appellant or Burton "would end up going down with him," and because Dorr told Burton that if she did not "hang" the appellant, Burton would never see her son again.

Brown maintained that Burton initially implicated the appellant for stealing Dorr's credit card—it was two weeks before the appellant's trial (and apparently just after Burton married the appellant) when Burton told Brown that Burton had stolen the credit card.

[¶ 43] The district court denied the appellant's motion for a new trial. On appeal, the appellant contends that the district court erred in denying his motion because this Court cannot "have confidence in the outcome of [the appellant's] trial." According to the appellant, Burton recanted her trial testimony and there was a reasonable likelihood that "the jury's judgment could have been affected by" Burton's false trial testimony. The appellant further argues that Burton's post-trial recantation "seriously" questioned the credibility of Dorr's and Brown's trial testimony.

[¶ 44] W.R.Cr.P. 33(a) states that the "court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." A district court has

discretion in determining whether to grant a motion for new trial. In determining whether the trial court abused its discretion, we must decide whether the court could have reasonably concluded as it did. *Baumgartner v. State,* 7 P.3d 912, 915 (Wyo.2000).... Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Anderson v. State,* 2002 WY 46, ¶ 25, 43 P.3d 108, ¶ 25 (Wyo. 2002) (citing *Vaughn v. State,* 962 P.2d 149, 151 (Wyo.1998)); *also see State v. Vinson,*

183 Wis.2d 297, 515 N.W.2d 314, 320–21 (App.1994).

*Morganflash v. State,* 2003 WY 120, ¶ 11, 76 P.3d 830, 835 (Wyo.2003).

■■■■ [¶ 45] A defendant who seeks a new trial based on newly discovered evidence typically must demonstrate the following:

(1) [t]hat the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that it did not come sooner; (3) that it is so material that it would probably produce a different verdict, if the new trial were granted; and (4) that it is not cumulative, viz., speaking to facts in relation to which there was evidence at the trial.

*Opie v. State,* 422 P.2d 84, 85 (Wyo.1967). *See also Griswold v. State,* 2001 WY 14, ¶ 8, 17 P.3d 728, 731 (Wyo.2001). We have said the following in an opinion involving a motion for a new trial based on recanted testimony:

We see no reason for deviating from the basic rule for evaluating district court decisions on motions for new trial. *Opie v. State,* 422 P.2d [84] at 85 [(Wyo.1967)]. However, we will enlarge on that general rule somewhat to provide additional guidance in cases, such as this, which involve recanted testimony. To that purpose, we agree with the Supreme Court of Montana that granting a person of questionable credibility and motive carte blanche to overturn the determination of a jury operating within the bounds of our constitutional protections is not conducive to the sound administration of justice. *State v. Perry,* 232 Mont. 455, 758 P.2d 268, 275 (1988). Therefore, we adopt the following rule espoused by that court, as well as several others:

"In light of the inherent suspicion surrounding recanted testimony and the public interest in swift and sure justice, we believe the better reasoned approach to be that adopted by the Supreme Court of Kansas:

" 'When a new trial is sought on the basis of recanting testimony of a prose-

cution witness, the weight to be given such testimony is for the trial judge passing on the motion for a new trial to determine. The trial judge is required to grant a new trial only when he [or she] is satisfied the recantation of the witness is true.' " ... *Id.* 758 P.2d at 275; (quoting *State v. Norman,* 232 Kan. 102, 652 P.2d 683, 689 (1982)). *See also Thacker v. Commonwealth,* 453 S.W.2d 566, 568 (Ky.1970).

*Brown v. State,* 816 P.2d 818, 822 (Wyo.1991). Recanted testimony

should be viewed with the utmost suspicion, *Sims v. State,* Wyo.1972, 495 P.2d 256, and when a motion for a new trial, based upon recantation, is denied by the trial court, this court will ordinarily be bound by that decision. *Espy v. State,* 1939, 54 Wyo. 291, 92 P.2d 549, 559. In *Flaim v. State,* Wyo.1971, 488 P.2d 153, this court quoted the following language which is most appropriate to this case: " 'There is no form of proof so unreliable as recanting testimony. * * * Those experienced in the administration of the criminal law know well its untrustworthy character.' " 488 P.2d at 155.

*Jones v. State,* 568 P.2d 837, 854 (Wyo.1977).

■■■■ [¶ 46] Considering the applicable standard of review, and the record before us, we cannot find that the district court abused its discretion in denying the appellant's motion for a new trial. It is apparent from the district court's comments during the motion hearing that it did not find Burton's post-trial recantation to be particularly credible. Furthermore, the district court also concluded (pursuant to *Opie* ) that Burton's post-trial testimony was not so material that it would probably produce a different verdict if the appellant were granted a new trial.[14] The appellant has not sufficiently articulated on appeal how the district court abused its discretion in this regard, especially considering: (1) that the only deviation of any significance between Burton's trial testimony and her alleged recantation is whether

14. We note that the instant case is not one in which the victim, or even a prosecution witness, is alleged to have recanted his or her trial testimony after the trial; interestingly, this is a case in which the appellant has asserted that a "critical" defense witness who testified favorably for the appellant claims to have testified falsely at trial.

Dorr actually gave Burton permission to take the credit card—Burton's testimony about what she communicated to the appellant thereafter has not changed; and (2) that the appellant's defense was (and apparently remains) that he reasonably believed that he had the authority to use Dorr's credit card because Burton told the appellant that Dorr had given her permission to use the credit card and the appellant was aware that Dorr had previously allowed Burton to use Dorr's credit cards. We add that the district court is usually "best situated to assess the probable impact of the evidence on a jury based on all the evidence presented at trial." *Griswold,* 2001 WY 14, ¶ 21, 17 P.3d at 734.

[¶ 47] As for the appellant's argument that Burton's post-trial sworn statement and hearing testimony also "seriously" questioned the credibility of Dorr's and Brown's trial testimony, we "have held that a new trial will not be granted if the defendant's newly discovered evidence merely impeaches a witness" or " 'contradicts evidence produced at the trial....' " *Keser v. State,* 737 P.2d 756, 760 (Wyo.1987); *Griswold,* 2001 WY 14, ¶ 14, 17 P.3d at 732 (*quoting Salaz v. State,* 561 P.2d 238, 243 (Wyo.1977)). *See also Terry v. State,* 2002 WY 162, ¶ 19, 56 P.3d 636, 642 (Wyo.2002).

### Sentencing

[¶ 48] The appellant argues that the district court abused its discretion and violated the appellant's due process rights in imposing its sentence. According to the appellant, the district court considered the appellant's " 'character,' " " 'motives,' " and " 'selfishness' " in imposing a five- to eight-year prison sentence, which factors were not admitted by the appellant or found by a jury as required by *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). The

appellant claims that "[h]ad [the district court] relied upon the actual, uncontested facts in the PSI, its conclusion would most likely have been more consistent with the defense's recommended sentence of two to four years, ... if even that much time." [15]

[¶ 49] Prior to sentencing, the appellant's trial counsel filed a motion requesting that the district court correct thirteen items in the presentence investigation report due to alleged inaccurate or incomplete information, as well as alleged clerical errors. The appellant also claimed that a purported victim impact statement included in the report was not made by a "victim" as that term is statutorily defined. At sentencing, the district court either corrected, or stated that it would not consider, six of these items and also would not consider the purported victim impact statement. The appellant's trial counsel was "unable to verify" the balance of the disputed items, and at sentencing withdrew her request that the district court address these items.

[¶ 50] The district court proceeded to hear argument from the prosecution and the appellant, noted that it had not "considered any materials outside the PSI in passing upon or considering issues of sentencing," and stated the following in imposing its sentence:

> Based upon a review of the PSI, the other information, considering all sentencing options including that of probation, as well as all other sentencing options were considered, and under the facts and circumstances, the Court finds that those options are inappropriate in this case.
>
> They're inappropriate for a number of reasons; one of which and most predominantly is it's apparent that Mr. Davis' past history with respect to abiding by conditions of supervised release of probation is, shall we say, poor. He has not been able

---

15. In a one-sentence argument, the appellant (*citing Manes v. State,* 2004 WY 70, ¶ 9, 92 P.3d 289, 292 (Wyo.2004)) also suggests that the prosecutor used an improper "community outrage" argument at sentencing. The appellant does not attempt to identify the argument at issue on appeal, or in *Manes,* with any particularity. In the absence of a more cogent appellate argument, we are unable to establish a nexus between the prosecutor's sentencing argument in the instant case and whatever argument was at issue in *Manes.* The appellant also has not directed us to anything in the record to indicate that the district court relied upon any such argument in sentencing the appellant.

to, by a number of instances, abide by those conditions. So, therefore, the Court does not feel that it would be an appropriate consideration.

Taking into consideration Mr. Davis' criminal history, it has—

It's puzzling, Mr. Davis, you come across as a very meek and mild individual. I don't know whether that's part of the game face or whether it's part of your personality. But the bottom line is, based upon your history, sir, you have lived a life based upon victimizing others in a lot of ways.

You take advantage of the kindness that the people in society have offered you. You appear to have not been able to learn anything from [a prior probation officer] because then we end up here. . . .

. . .

. . . But the bottom line is that you have not been able to conform your conduct to the laws of society. The issues concerning whether or not Ms. Burton misrepresented things to you or told you, we've already passed that water under the bridge. . . . But the bottom line is a jury of 12 found you guilty of the charges.

There were four counts of forgery in this matter. And based upon your history, this Court finds that a sentence of 5 to 8 years in the Wyoming State Penitentiary as to Count I, Count II, Count III, and Count IV is appropriate. Those sentences will be concurrent.

I put the 8 years there because, frankly, it's my hope after 5 years that the 3 years that you will be on some type of probation and parole that we will be able to verify that you've changed your ways, sir, because in the past you have not been able to.

Based upon your history and based upon all the facts and circumstances as set forth in the PSI, this Court finds that that is an appropriate sentence given the charges and given the situation you find yourself in before this Court.

[¶ 51] We have said that when imposing sentence, the trial court is given broad discretion to consider a wide variety of factors about the defendant and his crimes. *Mehring v. State,* 860 P.2d 1101, 1115 (Wyo.1993); *Griebel v. State,* 763 P.2d 475, 477 (Wyo.1988). We will not disturb a sentencing decision absent a clear abuse of discretion. *Jones v. State,* 771 P.2d 368, 371 (Wyo.1989). In sentencing, due process provides a right to be sentenced only on accurate information. *Mehring,* 860 P.2d at 1117; *Clouse v. State,* 776 P.2d 1011, 1014 (Wyo.1989). On appeal, the defendant must demonstrate that the trial court relied upon the statements in sentencing to prevail. *Mehring,* at 1115. "However, when no objection is made concerning the consideration of a particular factor, review is necessarily confined to a search for plain error. Plain error, as we have often stated, occurs when the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right." *Hornecker v. State,* 977 P.2d 1289, 1291 (Wyo.1999); *see also Craver v. State,* 942 P.2d 1110, 1115 (Wyo.1997). . . . "W.R.Cr.P. 32(a) specifically permits information about the prior criminal record of the defendant and his characteristics to be considered by the trial court before imposing sentence. In evaluating character, the trial court, in exercising its discretion, may consider a broad range of reports and information." [*Mehring,* 860 P.2d at 1116–17]; *see also Christy v. State,* 731 P.2d 1204, 1207–08 (Wyo.1987).

*Manes v. State,* 2004 WY 70, ¶ 9, 92 P.3d 289, 292 (Wyo.2004). The "abuse of discretion" standard has been previously set forth herein.

[¶ 52] We conclude that the appellant has not demonstrated that the district court abused its discretion in sentencing the appellant. After the district court either corrected, or stated that it would not consider, many of the disputed items contained in the presentence investigation report, the appellant's trial counsel withdrew her objection to the balance of the disputed items. The district court proceeded to sentence the appellant based on the remaining undisputed information contained in the presentence investigation report (particularly the appellant's crimi-

nal history and the nature of the crimes in the instant case). The information contained in the presentence investigation report supports the district court's view of the appellant's crimes, their attendant circumstances, and the appellant's character, and the district court's sentence did not exceed the maximum penalty provided for by Wyo. Stat. Ann. § 6–3–602(b). Beyond that, *Apprendi* and *Blakely* do not seem to apply to the circumstances of the instant case because both cases involved the determination of facts that would enhance a criminal penalty beyond the prescribed statutory maximum. *See Brown v. Greiner*, 409 F.3d 523, 530–535 (2nd Cir. 2005) and *People v. Rivera*, 2005 N.Y. Slip Op. 04614, 5 N.Y.3d 61, 800 N.Y.S.2d 51, 833 N.E.2d 194, 2005 WL 1362184.

### Cumulative Error

[¶ 53] The appellant also presents a cumulative error argument; however, given our resolution of the issues raised herein, we need not address this issue further.

[¶ 54] We affirm.